# In re Petition of Verizon New England Inc. d/b/a Verizon Vermont

[795 A.2d 1196]

No. 00-118

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed February 22, 2002

*Barbara G. Ripley* of *Wilson & White, P.C.*, Montpelier, *Sean A. Lev* of *Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C.*, Washington, D.C., and *Victor D. Del Vecchio* and *Gregory M. Kennan*, Boston, Massachusetts, for Appellant.

*Charles F. Storrow* of *Kimbell & Storrow*, Montpelier, and *Kenneth W. Salinger* of *Palmer & Dodge LLP*, Boston, Massachusetts, for Appellee AT&T Communications of New England, Inc.

*Leslie A. Cadwell* and *John J. Cotter*, Special Counsel, Montpelier, for Appellee Department of Public Service.

**Johnson, J.** Bell Atlantic-Vermont appeals an order of the Public Service Board requiring the telecommunications company to make certain facilities or services available to competitive local exchange carriers. Bell Atlantic-Vermont argues that the Public Service

Board's order is inconsistent with federal law, and is not supported by independent state authority. We hold that there is ample state authority to support the order of the Public Service Board, and that the order does not contradict federal law.[1] Accordingly, we affirm.

This case arises from the merger of New England Telephone & Telegraph Company with Bell Atlantic, which was approved by the Public Service Board (PSB) in February 1997. As part of the agreement, the PSB ordered the merged company, known as Bell Atlantic-Vermont (BAVT), to comply with the federal "competitive checklist" that is laid out in 47 U.S.C. § 271(c)(2)(B), part of the Telecommunications Act of 1996 (the Act). The checklist contains fourteen elements that were designed to regulate the entry of a Bell operating company into interLATA services (service between the local exchange and an outside exchange). This case, however, does not implicate the checklist, or the Act, directly. Rather, the PSB appropriated the checklist's requirements as a framework for constraining any anti-competitive effects of the merger of Bell Atlantic and New England Telephone & Telegraph. Thus, the PSB required BAVT's compliance with the federal competitive checklist as an exercise of the PSB's authority under state law to oversee the merger, not to implement the checklist or the Act themselves.

The PSB ordered BAVT to comply with the competitive checklist by September 1997. In June 1998, the PSB held a hearing to assess the extent to which BAVT had complied with the competitive checklist and enacted any necessary changes to its network.[2] After receiving recommendations from two hearing officers in June 1999, the PSB issued its final order in January 2000.

In that decision, the PSB determined that BAVT had not satisfied two elements of the competitive checklist, and ordered compliance with them. One element of the checklist requires BAVT to provide "[n]ondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 252(d)(1) of [47 U.S.C.]." 47 U.S.C. § 271(c)(B)(ii). Another item on the checklist obligates BAVT to ensure that "[t]elecommunications services are available for resale in accordance with the requirements of sections 251(c)(4) and

---

[1] Bell Atlantic-Vermont also argues that the PSB erred in denying a stay of its voice messaging requirement pending review by this Court. Given our resolution of this case, this claim is moot.

[2] BAVT was opposed at that hearing by appellees Department of Public Service (the Department) and AT&T Communications of New England, Inc.

252(d)(3) of this title." 47 U.S.C. § 271(c)(B)(xiv). The PSB held that BAVT had not complied with the nondiscriminatory access requirement of the competitive checklist because the company did not offer combinations of unbundled network elements (UNEs) that are ordinarily combined to provide service to a customer, but that are not currently physically combined, to competitors in the local exchange market. The PSB also found that BAVT had not complied with the element of the competitive checklist to resell telecommunications services because BAVT had not offered voice mail for resale to competitors. According to the PSB, its authority to order BAVT to provide combinations of UNEs is based both in the federal law referenced by the competitive checklist, as well as independent state law. In contrast, the PSB rested its decision to order BAVT to offer voice mail for resale solely on its authority under state law.

BAVT appeals from the decision, arguing that state law does not authorize the PSB to require the company to combine UNEs that are ordinarily combined at the request of a competitor. BAVT further contends that the federal law referenced in the competitive checklist does not require BAVT to provide a competitor with combinations of UNEs that are ordinarily combined, and thus any state law that mandates as much is preempted by federal law. Similarly, BAVT argues that it should not be required to resell voice mail as a telecommunications service to competitors because the PSB's jurisdictional grant over "telecommunications" does not include voice mail. BAVT claims that the federal definition of "telecommunications," which does not include voice mail, preempts the state definition, even if it includes voice mail, because the two definitions are inconsistent.

We affirm both determinations by the PSB on the ground that irrespective of federal law, state law authorizes the board to issue the challenged orders. We reject the claims of federal preemption because we do not find any aspect of relevant federal law inconsistent with the PSB's decision.

## I. *Regulatory Background*

The competitive checklist, and the federal law referenced within, are part of the Telecommunications Act of 1996, Pub. L. No. 104-104 (codified throughout 47 U.S.C. §§ 151-609). The Act fundamentally amends the Communications Act of 1934, 48 Stat. 1064, the principal

legislation that regulates telecommunications and established the FCC. According to the preamble, the 1996 Act's purpose is "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104 (1996). As such, the Act aims to restructure local telephone markets by imposing duties on incumbent local exchange carriers to open their networks to competition and by preventing states from enforcing laws that impede entry into local exchange markets.

The use of a federal statute by a state board is consistent with the federal government's approach to telecommunications regulation, in which states are considered partners in regulation. In both the 1934 Act and the 1996 Act, Congress has taken pains to preserve the overlapping jurisdiction of the states and the federal government over the telecommunications industry. Specifically, the language of the 1996 Act compels the conclusion that Congress did not intend to occupy the field of telecommunications regulation, and that it took explicit steps to maintain the authority of state regulatory bodies to enforce and work within the Act. For example, 47 U.S.C. § 251(d)(3) states:

> In prescribing and enforcing regulations to implement the requirements of this section, *the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission* that —
> (A) establishes access and interconnection obligations of local exchange carriers;
> (B) is consistent with the requirements of this section; and
> (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

(Emphasis added). Similarly § 252(e)(3) states "[n]otwithstanding paragraph (2), but subject to section 253 of this title, *nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law* in its review of an agreement . . . ." (Emphasis added.) Also § 261(c) states:

> *Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate*

*services that are necessary to further competition* in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.

(Emphasis added.) These various statutes preserving state authority are tied to specific aspects of the Act's requirements. Together, however, these statutes indicate that despite the detailed requirements the Act imposed on telecommunications operations, the regulatory scheme remains a partnership between federal and state authorities, in which states are granted broad power to regulate telecommunications as long as the states do not act inconsistently with federal law. Accord *Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd. of P.R.*, 189 F.3d 1, 14 (1st Cir. 1999) ("The Act exemplifies a cooperative federalism system, in which state commissions can exercise their expertise about the needs of the local market and local consumers, but are guided by the provisions of the Act and by the concomitant FCC regulations . . . .").

■ In Vermont, the Legislature has assumed those broad powers to regulate telecommunications by granting the PSB general authority over the industry. Three statutes define the board's jurisdiction in this area. Title 30 V.S.A. § 203(5) gives the PSB jurisdiction over a "company offering telecommunications service to the public on a common carrier basis." The extent of this jurisdiction is further explained by 30 V.S.A. § 209(a)(3), which grants the board jurisdiction over the "manner of operating and conducting any business subject to supervision under this chapter, so as to be reasonable and expedient, and to promote the safety, convenience and accommodation of the public." Finally, 30 V.S.A. § 2701 states that the board may require connections between "two or more telephone companies . . . whose lines can be made to form a continuous line of communication, by the construction and maintenance of suitable connections, for the transfer of messages or conversations, and that public convenience and necessity will be subserved thereby." Because of the concurrence of federal and state authority over BAVT, our inquiry need not extend beyond whether the PSB has the authority under these state laws to impose the challenged requirements, and if so, whether the exercise of that authority is consistent with federal law.

## II. *Nondiscriminatory Access*

The nondiscriminatory element of the competitive checklist requires BAVT to comply with the section of the Act that governs the general duty of telecommunications carriers to interconnect their facilities to allow for competition. For the purposes of the Act, BAVT is considered an incumbent local exchange carrier (ILEC), which simply means that BAVT is the current provider of local telephone service and that it already owns many of the network facilities to which a competitive local exchange carrier (CLEC) would need access to offer its own service. 47 U.S.C. § 251(c)(3), referenced in the competitive checklist, imposes on BAVT:

> [t]he duty to provide, to any requesting telecom-munications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions . . . . An *incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service."* (Emphasis added.)

Section 252(d)(1), also referred to by the competitive checklist, sets forth the pricing standards for the network elements that an incumbent may charge, but that statute is not relevant to this dispute. UNEs are the facilities and equipment, including electronic systems, needed to provide telephone service to a particular customer. 47 U.S.C. § 153(29). In the typical local exchange network, the ILEC controls the majority of the UNEs needed to provide service. In order for a competitor to offer local telecommunications service, the CLEC may either construct an entire network of its own — an obvious burden to market entry — or it may access the incumbent's network elements through the methods described in the Act. Certain elements, however, must be combined in order to provide service to a particular area or customer. Because the UNEs belong to the incumbent, one method for a CLEC to establish local exchange service is to request that the incumbent combine its UNEs in a manner that allows the CLEC to connect its facilities with the combined UNEs, so that the competitor may provide service to a particular customer.

■ BAVT argues that the state jurisdictional statutes do not grant the board the necessary authority to require the company to offer combinations of UNEs because there is no statute that requires BAVT to "improve its network for the benefit of competitors." This argument, however, is based on BAVT's characterization of the PSB order, which we find unpersuasive. Drawing from 47 U.S.C. § 251(c)(3), the PSB order requires BAVT to connect certain network elements that it normally combines at the request of a CLEC "in order to facilitate local exchange competition." While it is true that this step may benefit a competitor by making competition possible in the first place, this is the stated intention of the 1996 Act. See *supra*. Furthermore, such connections are plainly contemplated by 30 V.S.A. § 2701, which "require[s] that [a] connection be made" if a "physical connection can reasonably be made" between "two or more telephone companies." *Id.* In keeping with the language of that statute, the PSB order mandates connections between two companies — BAVT and a CLEC — even if a particular combination of UNEs must be connected within BAVT's network in order to facilitate the overall connection between the competitor's facilities and BAVT's network. See *id.*

■ Second, BAVT contends that the board's authority extends only to regulating how BAVT operates and conducts "its business with its customers." This assertion, however, has no support in the plain language of the statutes. The general grant of authority contained in § 209(a)(3) includes "operating and conducting any business subject to supervision under this chapter." 30 V.S.A. § 209(a)(3). No limitation restricts the board to regulating a business's dealing only with its customers, but rather the jurisdictional statute extends the PSB's authority to BAVT's entire operation. In exercising this authority, the PSB order properly concerns how BAVT operates and conducts its business in Vermont by modifying the manner in which it provides UNEs to CLECs.

When reviewing a decision by the PSB, this Court defers to the board's expertise and informed judgment. *In re Vt. Elec. Power Producers, Inc.*, 165 Vt. 282, 288, 683 A.2d 716, 719 (1996). We apply a strong presumption of validity to board orders and will accept its conclusions and findings unless they are clearly erroneous. *In re Green Mountain Power Corp.*, 162 Vt. 378, 380, 648 A.2d 374, 376 (1994). Absent a compelling indication of error, we will not disturb an agency's interpretation of statutes within its particular area of

expertise. *In re Prof'l Nurses Serv., Inc.*, 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996). Additionally, our paramount goal in statutory construction is to give effect to the Legislature's intent, *Burlington Elec. Dep't v. Vermont. Dep't of Taxes*, 154 Vt. 332, 335, 576 A.2d 450, 452 (1990), and we apply the plain meaning of a statute where the language is clear and unambiguous. *Reed v. Glynn*, 168 Vt. 504, 506, 724 A.2d 464, 465 (1998).

Given our deferential standard of review of agency interpretations of statutes within its expertise, we have no difficulty concluding that the PSB properly exercised its authority under state law. Particularly, we agree with the PSB that 30 V.S.A. § 209(a)(3) gives it broad authority to regulate telecommunications companies to further competition in Vermont's local exchange market. To the extent that § 209(a)(3) and § 2701 provide overlapping authority by delineating both general and specific authority to the board, we do not find either of the statutes to be superfluous. Cf. *In re Margaret Susan P.*, 169 Vt. 252, 263, 733 A.2d 38, 47 (1999). The complexity and scope of the PSB's jurisdiction explains the Legislature's need to describe the PSB's authority both generally and specifically. Thus, the PSB order requiring BAVT to provide combinations of UNEs that it ordinarily combines to CLECs is consistent with and authorized by state law.

Having found that the PSB has state authority for its order, the only remaining question is whether federal law preempts that authority.[3] The supremacy clause of the United States Constitution allows federal law to preempt fully state and local laws. U.S. Const. art. VI, cl. 2; *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). As discussed above, however, the 1996 Act is part of a scheme of federal and state regulation of telecommunications in which state law coexists with federal law. Because the original PSB order's incorporation of the competitive checklist required compliance with 47 U.S.C. § 251(c)(3) of the Act, it follows that the accompanying statute regarding preservation of state authority, 47 U.S.C. § 251(d)(3), controls our inquiry. Specifically, § 251(d)(3) preserves state authority to regulate the interconnection requirements of telecommunications carriers as long as such requirements are not inconsistent with the Act. See *id.*

---

[3] BAVT casts this argument twice in its briefs. First, it argues that the PSB order violates federal law and second that the PSB order was preempted by federal law. Both of these arguments, however, hinge on the same claim — that the PSB order is inconsistent and conflicts with federal law. We thus address this central question only once.

Although we have recognized that "[t]here are four ways in which federal law can preempt state law: explicit or implicit statutory language, actual conflict, or occupation of the field," *In re Commercial Airfield*, 170 Vt. 595, 595, 752 A.2d 13, 14 (2000) (mem.), the only element at issue here is whether "it is impossible for a private party to comply with both state and federal law." *Crosby*, 530 U.S. at 372; *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963). State law will be preempted when there is actual conflict with federal law, but "there is no actual conflict where a collision between two regulatory schemes is not inevitable." *In re Stokes Communications Corp.*, 164 Vt. 30, 38, 664 A.2d 712, 717 (1995). We must determine, therefore, whether there is any aspect of the PSB's order, and by extension, the state law that authorized it, that conflicts with 47 U.S.C. § 251(c)(3). In other words, the question before us is whether the Act prevents the PSB from requiring BAVT to provide combinations of UNEs that it ordinarily combines, but that are not currently combined to CLECs.

The status of federal law on this question is in flux. The FCC issued a key rule following the passage of the Act that purported to interpret the scope of § 251(c)(3)'s directive to ILECs to combine UNEs. One part of that rule, 47 C.F.R. § 51.315(b) states, "an incumbent LEC shall not separate requested network elements that the incumbent LEC currently combines." While this subsection of the rule prevented ILECs from separating UNEs that were already combined, the next part requires an ILEC "to combine unbundled network elements in any manner, even if those elements are not ordinarily combined in the incumbent LEC's network." 47 C.F.R. § 51.315(c). The PSB's order, which requires the incumbent LEC to combine elements, but only those elements that *are* ordinarily combined in the ILEC's network, falls somewhere in the middle of these two sections.

This rule, however, was challenged across the country, and the cases were consolidated in the Eighth Circuit. In *Iowa Utilities Board v. F.C.C.*, 120 F.3d 753 (8th Cir. 1997), the court struck down both 47 C.F.R. § 51.315(b) and (c) on the grounds that they were inconsistent with the Act. The court held that the language of 47 U.S.C. § 251(c)(3) does not "levy a duty on the incumbent LECs to do the actual combining of elements." *Iowa Utilities*, 120 F.3d at 813. The court invalidated 47 C.F.R. § 51.315(b) because "the rule would permit the new entrant access to the incumbent LEC's network

elements on a bundled rather than an unbundled basis." *Iowa Utilities*, 120 F.3d at 813. Two years later, the Eighth Circuit decision in *Iowa Utilities* concerning 47 C.F.R. § 51.315(b) was reversed by the United States Supreme Court. In *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), the Court reinstated § 51.315(b) because, without that section of the rule, "incumbents could impose wasteful costs on even those carriers who requested less than the whole network. It is well within the bounds of the reasonable for the Commission to opt in favor of ensuring against an anticompetitive practice." *Id.* at 395. The Court did not address the validity of the remainder of 47 C.F.R. § 51.315, namely whether § 51.315(c) was within the bounds of the Act.

Following *AT&T*, therefore, it remains an open question whether the FCC regulation that would explicitly require an incumbent to offer combinations of UNEs not currently combined to a CLEC, 47 C.F.R. § 51.315(c), is valid.[4] We need not, however, resolve this question to adjudicate the current dispute because the federal scheme does not outline any limitations on state authority to regulate above and beyond the minimum requirements of the Act. Regardless of whether 47 C.F.R. § 51.315(c) is valid, there is nothing in this regulation, or any other, or in the Act itself that prevents a state from requiring BAVT to provide combinations of UNEs. For even if we assume that federal law does not require such combinations, and we assume that § 51.315(c) remains invalid as per *Iowa Utilities*, nothing in federal law *prohibits* the PSB from ordering such combinations to facilitate competition in local markets.

It is a well established principle of our federalism that federal law sets only a floor the requirements of which may be exceeded by state law. Thus, there can be no claim of preemption where federal law intends for states to enforce their own regulatory requirements, in addition to the minimum requirements set by federal law. See *Vt. Agency of Natural Resources v. Duranleau*, 159 Vt. 233, 236-37, 617 A.2d 143, 145 (1992). Cf. *State v. Kirchoff*, 156 Vt. 1, 4, 587 A.2d 988, 991 (1991) (holding that Vermont Constitution is more protective of

---

[4] Indeed, to ground its order in federal law, the PSB determined that 47 C.F.R. § 51.315(b), which was reinstated by *AT&T*, encompasses the requirement that BAVT combine UNEs that are ordinarily combined in its network. Additionally, the PSB concluded that although *AT&T* did not explicitly reinstate § 51.315(c), the rule requiring ILEC's to combine even those UNEs not ordinarily combined in the network, the reasoning of the decision makes clear that the Court intended to validate that part of the rule as well.

"open fields" from search and seizure than the United States Constitution); *State v. Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982) ("We are free, of course, to provide more generous protection to rights under the Vermont Constitution than afforded by the federal charter.").

More importantly, compliance with the PSB order does not interfere with BAVT's ability to comply with federal law. Nor can we envision how conflict between the state and federal regulatory schemes is "inevitable." *Stokes Communications*, 164 Vt. at 38, 664 A.2d at 717. We confronted the question of whether a state regulation conflicted with a federal scheme in *In re Vicon Recovery Systems*, 153 Vt. 539, 572 A.2d 1355 (1990). In that case, the parties argued that the PSB was preempted from regulating a contract concerning power generation rates because of the federal Public Utility Regulatory Policies Act of 1978 (PURPA). Although PURPA regulates rates for power generation, there was nothing in the act to prevent utilities from agreeing to a rate different from what would otherwise be required by the federal law. *Id.* at 544, 572 A.2d at 1358. We held that the PSB was not preempted from regulating the contract (i.e. the agreed upon rate), because the exercise of state authority did not conflict with federal law, which "specifically decline[d] to regulate the rate . . . at issue." *Id.* at 544, 547, 572 A.2d at 1358-59.

Similarly, here the PSB order does not conflict with "the terms, policies and practices" of the 1996 Telecommunications Act. *Id.* at 546, 572 A.2d at 1358 (internal citation omitted). Thus, a state board would be preempted from, for example, requiring an ILEC to separate already combined UNEs because this requirement would be inconsistent with 47 C.F.R. § 51.315(b) and *AT&T*. For the PSB, however, to exceed the requirements of § 51.315(b) and require BAVT to combine UNEs is not inconsistent with the federal Act. Thus, we hold that this element of the PSB's order is not inconsistent with the Act and is therefore not preempted by federal law.

### III. *Resale of Telecommunications Services*

The resale element of the competitive checklist requires BAVT to comply with the section of the Act that imposes on incumbents the duty to offer for resale various telecommunications services, so that a CLEC may purchase the service from BAVT and then resell the

service to a customer. The section referenced in the competitive checklist states that BAVT has:

> The duty —
> (A) to offer for resale at wholesale rates *any telecommunications service* that the carrier provides at retail to subscribers who are not telecommunications carriers; and
> (B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service . . . .

47 U.S.C. § 251(c)(4) (emphasis added). The resale component of the competitive checklist also refers to § 252(d)(3), which sets forth the procedure by which a state board sets wholesale prices, but that section is not in dispute. The PSB determined that one of the telecommunications services that BAVT has to offer for resale is voice mail. Voice mail functions much like a traditional stand alone answering machine except the messages are stored by the local exchange service company. Customers retrieve their messages by dialing the service provider's network and listening to the messages over the telephone.

BAVT argues that there is no state authority to require the resale of voice mail because the state jurisdictional grant over "telecommunications" does not include voice mail. In granting the PSB authority over a "company offering telecommunications service to the public," the Legislature defined "telecommunications service" as:

> [T]he transmission of any interactive two-way electromagnetic communications, including voice, image, data and information. Transmission of electromagnetic communications includes the use of any media such as wires, cables, television cables, microwaves, radio waves, light waves or any combination of those or similar media. Telecommunications service does not include value added nonvoice services in which computer processing applications are used to act on the form, content, code and protocol of the information to be transmitted unless those services are provided under tariff approved by the public service board.

30 V.S.A. § 203(5). BAVT claims that voice mail is a "value added nonvoice service," and thus falls precisely within the area the Legislature excluded from the PSB's authority. Voice mail, according to BAVT, is not a transmission service, but rather a "storage and retrieval service" that is not part of local telephone service. BAVT places great significance on the separation between voice messaging and telephone service that results from the fact that voice mail involves a computer storing information in digital form before it is transmitted to the intended recipient. BAVT contends that the storage and delay are the "value added" to the normal transmission service that exempts voice mail from the PSB's regulation.

The Department counters that voice mail fits squarely within the definition of a "telecommunications service" and that, as a matter of policy, requiring the resale of voice mail promotes competition for local exchange customers. The PSB defines voice messaging as a "two-way electromagnetic communication" that delays the transmission of the voice of the sender until a later time. Although the information is delivered at a different time, it remains unchanged in form or content, and thus there is no "value added" to voice mail, according to the PSB. The PSB found that voice mail has become widely used and is almost an expected element of local telephone service. Therefore, the PSB determined that requiring the resale of voice mail by BAVT was necessary to promote the entry of CLECs into the local exchange market.

Whether voice mail is a "telecommunications service" or a "value added nonvoice service" as a matter of state law is a question left to the expertise of the PSB. Our standard of review dictates that we avoid redeterminations of such technical issues absent clear error. *In re Green Mountain Power*, 162 Vt. at 380, 648 A.2d at 376. Although BAVT's arguments present a plausible alternative characterization of voice mail, they do not approach identifying clear error in the PSB's decision. We accept, therefore, the PSB's decision that voice mail is a "telecommunications service" under the state law definition of 30 V.S.A. § 203(5). See *In re Twenty-Four Vt. Utilities*, 159 Vt. 339, 361, 618 A.2d 1295, 1308 (1992) ("[W]e accept the construction of a statute by the administrative body responsible for its execution."). It follows that the PSB's order requiring BAVT to offer voice mail for resale is consistent with the board's jurisdictional grant. The PSB found that the demand for voice mail is growing and that voice mail provides improved access and functionality over

customer-owned answering machines. Requiring BAVT to make voice mail available to competitors is thus likely to increase the ability of CLECs to sell their services to telephone customers. Given these facts, the PSB's order satisfies the mandate of 30 V.S.A. § 209(a)(3) that the PSB promote the "convenience and accommodation of the public," by fostering competition between the incumbent and CLECs. *Id.* We conclude that state law authorizes the PSB to require BAVT to offer voice mail for resale.

BAVT next argues that the PSB is preempted from regulating voice mail because the federal definition of "telecommunications service" excludes voice mail, superseding the state's definition of the term. Federal law does define "telecommunications service" differently from Vermont law. The federal definition includes "the offering of telecommunications for a fee directly to the public," 47 U.S.C. § 153(46), and defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id.* § 153(43). Although voice mail appears to meet this definition, federal law has defined another category of services called "information service," which includes voice mail. Information services are "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." *Id.* § 153(20). The FCC has stated that voice mail meets the definition of an "information service" and that an "information service" cannot also be a "telecommunications service" because the two are "separate non-overlapping categories." *In re Federal-State Joint Board on Universal Serv.*, 13 F.C.C.R. 11501, 11507-08 (1998); *In re Application of BellSouth Corp. for Provisions of In-region Interlata Serv. in La.*, 13 F.C.C.R. 20599, 20780-81 (1998). Accordingly, we agree with BAVT that as a matter of federal law, the competitive checklist, which requires only that "telecommunications service" be made available for resale, does not apply to voice mail.[5]

---

[5] In its original order, in which the PSB based its voice mail decision in part on federal law, the PSB stated its belief that, based on more recent FCC rulings, "information services" and "telecommunications services" are no longer mutually exclusive. If this assessment were accurate, voice mail may fall within the ambit of a federal telecommunications service. On appeal, however, neither party advocates this position, and thus we will assume that federal law does not require the resale of voice mail as a telecommunications service.

Despite the federal definition of voice mail, BAVT's argument is misguided. As discussed above, the PSB is using the federal Act as a reference point to guide the merger between two telephone companies. In this docket, the PSB has not required that BAVT comply with the competitive checklist, or the other sections of the Act referenced therein as a matter of federal law, but rather as a matter of state law. Thus the requirement that BAVT offer "[t]elecommunications services . . . for resale," 47 U.S.C. § 271(c)(2)(B)(xiv), is a requirement of state law. Because we conclude that the PSB's order was consistent with and authorized by state law, we must examine only whether this state law is inconsistent or conflicts with the federal law.

■ There is no conflict. By defining voice mail as an "information service" and making "information service" mutually exclusive with "telecommunications service," the FCC has removed voice mail from the Act's relevant provisions entirely. Simply put, state law regulating voice mail does not conflict with the Act because the Act does not regulate voice mail. As noted above, state law does not interfere with federal law where state law imposes stricter standards than federal law. See n.3 *supra*; *Florida Lime & Avocado Growers*, 373 U.S. at 142-43 (minimum federal agricultural produce standards do not preempt more demanding state standards). By extension, where federal law is silent on the issue, there is no basis to conclude that state law conflicts with federal law. Indeed, state regulation that reaches beyond federal law was explicitly contemplated by the Act and its predecessor, the 1934 Communications Act. See *Iowa Utility Bd.*, 120 F.3d at 806 ("It is entirely possible for a state interconnection or access regulation, order, or policy to vary from a specific FCC regulation and yet be consistent with the overarching terms of section 251 [of 47 U.S.C.]."); see also *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 375 (1986) ("The Communications Act . . . establishes dual state and federal regulation of telephone service; it also recognizes that jurisdictional tensions may arise . . . ."). As there is no conflict with federal law, the PSB was free to act within the authority granted to it by state law and require the resale of voice mail.

*Affirmed.*