2014 VT 29

**In re Programmatic Changes to the Standard-Offer Program and Investigation into the Establishment of Standard-Offer Prices under the Sustainably Priced Energy Enterprise Development (SPEED) Program**

[95 A.3d 999]

No. 13-308

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**

Opinion Filed March 28, 2014

*Wesley M. Lawrence* of *Theriault & Joslin, P.C.*, Montpelier, and *Thomas Melone* and *Michael Melone* of *Allco Renewable Energy Limited*, New York, New York, for Appellant Ecos Energy LLC.

*Jeanne Elias*, Special Counsel, Montpelier, for Appellee Department of Public Service.

¶ 1. **Crawford, J.** Applicant Ecos Energy, LLC appeals from the Public Service Board's decision that its proposed solar power project does not qualify for a standard-offer power purchase contract under Vermont's Sustainably Priced Energy Enterprise Development (SPEED) program because it exceeds the statutory limit on generation capacity. We reverse.

¶ 2. The Legislature established the SPEED program in 2005 to promote development of renewable energy in Vermont. 30 V.S.A. §§ 8001, 8005, 8005a. The statute promotes this goal in two ways: by requiring electric utilities to purchase a certain amount of

power from renewable energy sources, and by creating a standard-offer program. Under the standard-offer program, the Board authorizes certain long-term power-purchase contracts with electrical providers in Vermont for renewable energy projects that have a nameplate capacity of 2.2 megawatts (MW) or less and meet certain other criteria. *Id.* § 8005a(b). Once a plant owner executes a standard-offer contract, the Board guarantees a set price for that plant's energy for the duration of the contract regardless of whether the market price changes. *Id.* § 8005a(f)(4). The standard-offer program is administered by the SPEED facilitator, VEPP, Inc., which operates under a contract with the Board. *Id.* § 8005a(a).

¶ 3. In 2009, after soliciting public comment, the Board issued an order in which it prescribed various procedures and requirements for the standard-offer program. During the comment process, VEPP asked the Board to clarify how a plant was defined, stating that "the tenor of some questions it had received from developers indicated that at least some developers were anticipating construction of multiple plants at a single location that, collectively, exceed the 2.2 MW cap." One of the participants in the implementation process, Central Vermont Public Service, commented that separate projects would need to enter into separate interconnection agreements with the utility, enter into separate standard contracts, and obtain separate certificates of public good. Another participant, Renewable Energy Vermont, commented that the statute was clear that "separate plants that share common infrastructure and interconnection should be considered as one plant."

¶ 4. In response to these comments, the Board ordered that "[t]o the extent that any generation components share common infrastructure, we direct [VEPP] to consider these components as a single plant." It ordered VEPP to identify and inform the Board of applications that would be on the same parcel of land or contiguous parcels of land and would collectively exceed the 2.2 MW cap, and stated that "[t]o the extent required, the Board will make case-by-case determinations as to whether [such] projects constitute a single plant for purposes of § 8002(12)."[1] The Board did not state what criteria would be used to determine whether

---

[1] Section 8002(12) was subsequently renumbered as § 8002(14). 2011, No. 170 (Adj. Sess.), § 10.

multiple projects constituted a single plant, either in the 2009 order or in any other order or rule.

¶ 5. In April 2013, VEPP issued a request for proposals (RFP) for projects that would be eligible for a power-purchase agreement under § 8005a. The RFP indicated that standard-offer contracts would be offered to proposals in order of price, starting with the lowest-priced projects, until the annual capacity cap was reached. In response, applicant proposed three 2.0 MW solar projects — the Bennington Solar project, the Apple Hill Solar project, and the Sudbury Solar project. Of the thirty-four proposals submitted, applicant's three projects were the lowest-priced projects.

¶ 6. VEPP filed a report with the Board detailing the RFP results. VEPP noted that the Bennington project and the Apple Hill project would be located on the same parcel of property and the generation components of the project were "physically contiguous." It requested that the Board make a determination as to whether or not the two projects constituted a single plant. If so, the combined capacity of the plant (4.0 MW) would exceed the standard-offer program limit of 2.2 MW.

¶ 7. The Board issued an order on May 16, 2013 in which it ruled that the Bennington and Apple Hill projects consisted of a single 4.0 MW plant "[b]ecause both proposals are located on the same parcel of land and have similar interconnection points." The Board accepted the Bennington project and disqualified the Apple Hill project, which had a higher price. The Board authorized VEPP to enter into standard-offer contracts with applicant for the Bennington and Sudbury projects.

¶ 8. Applicant subsequently petitioned the Board to reconsider and modify its order. Applicant argued that the Bennington and Apple Hill projects were "independent technical facilities" because as proposed they would connect with the electric grid through separate three-phase lines, be separated by a fence, have separate access roads, use separate inverters, transformers and other equipment, and have different financing parties. The Board issued an order on June 28, 2013 stating that "[w]hile the projects may be operationally independent, they are still being advanced by the same developer, located on the same parcel of land, and adjoining each other. Based on our review of the site plans . . . it is reasonable to infer that they are a single plant." The Board stated that applicant's interpretation of independence would permit "any

size facility [to] be constructed so long as it could be partitioned into 'technically independent' 2.2 MW pieces by including redundant equipment and separating each piece by a mere fence." The Board reasoned that this type of clustered development would frustrate the legislative goal of distributing small-to-moderate facilities across the state's electric grid.[2] Applicant appeals the Board's May and June 2013 orders.

¶ 9. In reviewing decisions of the Public Service Board, "we defer to the Board's expertise and informed judgment, and apply a strong presumption of validity to its orders." *Grice v. Vt. Elec. Power Co.*, 2008 VT 64, ¶ 7, 184 Vt. 132, 956 A.2d 561 (quotations omitted). "Absent a compelling indication of error, we will not disturb an agency's interpretation of statutes within its particular area of expertise." *In re Verizon New Eng., Inc.*, 173 Vt. 327, 334-35, 795 A.2d 1196, 1202 (2002). However, "we do not abdicate our responsibility to examine a disputed statute independently and ultimately determine its meaning." *In re MacIntyre Fuels, Inc.*, 2003 VT 59, ¶ 7, 175 Vt. 613, 833 A.2d 829 (mem.). Our "paramount goal" in construing a statute is to give effect to the intent of the Legislature. *Murdoch v. Town of Shelburne*, 2007 VT 93, ¶ 5, 182 Vt. 587, 939 A.2d 458 (mem.). We will apply the plain meaning of a statute where it is clear and unambiguous. *In re Verizon New Eng.*, 173 Vt. at 335, 795 A.2d at 1202.

¶ 10. ■ In this case, there is a "compelling indication of error." *Id.* at 334-35, 795 A.2d at 1202. The Board's conclusion that the Bennington and Apple Hill projects constitute a single plant is contrary to the plain language of the statute. Section 8002(14) defines a plant as follows:

---

[2] The Board also justified its decision by reasoning that the Legislature permitted streamlined review available to SPEED projects under 30 V.S.A. § 248 because of their reduced environmental impacts and that larger facilities would have a more significant impact, making the simplified procedures inappropriate. As neither applicant nor the Department addressed this argument on appeal, we will not consider it. We note, however, that each of the projects proposed by applicant will be required to obtain a separate certificate of public good (CPG) in accordance with § 248. That section precludes use of the streamlined procedure referred to by the Board where a proposed project "raise[s] a significant issue with respect to the substantive criteria" of § 248, including environmental criteria. 30 V.S.A. § 248(b), (j)(1)(C). Thus, if the side-by-side projects have a significant impact on the environment, applicant may not be entitled to streamlined review of its CPG petitions.

> "Plant" means an independent technical facility that generates electricity from renewable energy. A group of newly constructed facilities, such as wind turbines, shall be considered one plant if the group is part of the same project and uses common equipment and infrastructure such as roads, control facilities, and connections to the electric grid.

The second sentence makes clear that electrical generation facilities are not independent if they share technical features such as equipment and infrastructure. The logical corollary of the second sentence is that facilities that are *not* part of the same project and do not share equipment and infrastructure should be considered separate plants.

¶ 11. The statute makes no mention of physical proximity or common ownership as relevant factors in determining whether facilities are separate plants. The Legislature could easily have included these factors if it had intended them to be considered, as it has elsewhere. For example, 30 V.S.A. § 219a(a)(4), which was added in 2011, states that "[a] group of structures or pieces of equipment shall be considered one facility" for purposes of determining eligibility for net metering "if it uses the same fuel source and infrastructure and is located in close proximity." The statute goes on to state that "[c]ommon ownership shall be relevant but not sufficient to determine that such a group constitutes a facility." *Id.* When the Legislature enacted this provision, it simultaneously made various modifications to § 8002. 2011, No. 47, § 7. Notably, it did not choose to alter the definition of a "plant" in § 8002(14).

¶ 12. ■ Under the plain language of the statute, then, as proposed, the Bennington and Apple Hill projects would qualify as "independent technical facilities." 30 V.S.A. § 8002(14). The projects will not share common roads, control facilities, or connections to the electric grid. Each of the projects will have a separate interconnection agreement with GMP and separate interconnection facilities designed and owned by GMP, which would limit the capacity of each to 2.0 MW. Each project must obtain a separate certificate of public good pursuant to 30 V.S.A. § 248. As independent plants, both should have been awarded standard-offer contracts under the terms of the RFP because they were the lowest and second-lowest priced projects, respectively.

¶ 13. We disagree that interpreting the statute according to its plain meaning will permit "any size facility [to] be constructed so long as it could be partitioned into 'technically independent' 2.2 MW pieces by including redundant equipment and separating each piece by a mere fence," as the Board warned in its June order. As a practical matter, the facility would still have to be cost-effective to build. Although it was economically feasible for applicant to install separate roads, equipment, and infrastructure and obtain separate permits and contracts for these two projects, it will not always be cheaper or more efficient for plants to be located next to each other. As the Board itself noted, there is no evidence that the prices proposed by applicant were artificially low due to any economies of scale gained by having two facilities side by side. The requirement that each project obtain its own CPG also operates as a check against abuse of the standard-offer program. See 30 V.S.A. § 248(j)(1)(C) (requiring full review of CPG petition where project "raise[s] a significant issue with respect to the substantive criteria" of § 248, including environmental criteria).

¶ 14. ■ Our interpretation of § 8002(14) is consistent with the Legislature's stated goals of encouraging the development of renewable energy in a way that provides affordable prices to the ratepayers of Vermont. See 30 V.S.A. § 8001(a). Contrary to the Board's position, it is not inconsistent with the legislative goal of "[p]roviding support and incentives to locate renewable energy plants of small and moderate size in a manner that is distributed across the State's electric grid." 30 V.S.A. § 8001(a)(7). While the Legislature has not explicitly defined the terms "small" or "moderate," language elsewhere in the SPEED statute provides some indication of the intended meaning. Section 8007, which is entitled "Small renewable energy plants; simplified procedures," states that renewable energy plants of 2.2 MW or less are entitled to streamlined approval procedures. The title of § 8007 suggests that the Legislature considers "small" plants to be those with capacities of less than 2.2 MW. A cluster of plants totaling 4.0 MW therefore could reasonably be defined as "moderate" in size.[3]

---

[3] The word "small" is also used in § 8005a(b). That section states that standard-offer plants must be "qualifying small power production" facilities under federal law, which defines such facilities as those with generation capacities of less than 80 MW. 18 C.F.R. § 292.204(a)(1). The combined capacity of the Bennington and Apple Hill plants is well within this definition of a "small" plant.

¶ 15. Indeed, many much larger projects have been developed under the SPEED program, such as the Coventry Landfill Methane project (8 MW) or the Kingdom Community Wind project (63 MW). Other large projects are in active development, such as the Deerfield Wind project (30 MW). Although they are not standard-offer projects, the legislative goal set forth in § 8001(a)(7) also applies to these types of projects, each of which generates or will generate a much greater amount of electricity at a single location than the adjacent facilities proposed by applicant. It is highly unlikely that the Board would have approved these projects if they were incompatible with the goals of the SPEED program. If these projects are consistent with legislative intent, then applicant's adjacent projects must be also.

¶ 16. ▮ The Board's decision in this case effectively imposed additional nonstatutory eligibility criteria on potential SPEED project developers without prior notice. Although the Board stated in its 2009 order that it would consider on a case-by-case basis whether projects located on the same parcel of land were separate plants, it did not offer any guidelines or promulgate any rules regarding what criteria it would consider in making this decision. Nor does the RFP indicate that projects proposed by the same developer or on the same parcel of land will be considered to be a single plant even if they otherwise comply with the statute. While the Board is ordinarily entitled to deference in its interpretation of a statute within its area of expertise, we cannot uphold its decision in this case because it was clearly erroneous. See *In re Sleigh ex rel. Unnamed Motorists*, 2005 VT 45, ¶ 10, 178 Vt. 547, 872 A.2d 363 (mem.) ("Although we give deference to the construction of a statute by an agency responsible for administering it, statutory interpretation is a question of law, and we cannot affirm an unjust or unreasonable interpretation of a statute.").

*The Board's May 2013 and June 2013 orders are reversed. We remand the case to the Board for further agency action consistent with this decision.*