2014 VT 29



In re Programmatic Changes to the Standard-Offer Program and
Investigation into the Establishment of Standard-Offer Prices under the
Sustainably Priced Energy Enterprise Development (SPEED) Program (2013-308)

 

2014 VT 29

 

Filed [28-Mar-2014]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40
as well as formal revision before publication in the Vermont Reports. 
Readers are requested to notify the Reporter of Decisions by email at:
JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State
Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections
may be made before this opinion goes to press.

 

 


 2014 VT 29
 
  


 No. 2013-308
 
  


 In re Programmatic Changes to the
 Standard-Offer Program and Investigation into the Establishment of
 Standard-Offer Prices under the Sustainably Priced 
 Energy Enterprise Development (SPEED) Program
 
 
 Supreme Court
 
 
  
 
 
 On Appeal from
 
 
     
 
 
 Public Service Board 
 
 
  
 
 
  
 
 
  
 
 
 January Term, 2014
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 James
 Volz, Chair
 
 
  
 
 Wesley M. Lawrence of Theriault
& Joslin, P.C., Montpelier, and Thomas Melone and 

  Michael Melone of Allco Renewable Energy Limited, New York, New York, for
Appellant

  Ecos Energy LLC.

 

Jeanne Elias, Special Counsel, Montpelier, for Appellee
Department of Public Service.

 

 

PRESENT:  Reiber, C.J.,
Dooley, Skoglund, Robinson and Crawford, JJ.

 

 

¶ 1.            
CRAWFORD, J.   Applicant Ecos
Energy, LLC appeals from the Public Service Board’s decision that its proposed
solar power project does not qualify for a standard-offer power purchase
contract under Vermont’s Sustainably Priced Energy Enterprise Development
(SPEED) program because it exceeds the statutory limit on generation capacity.
 We reverse.

¶ 2.            
The Legislature established the SPEED program in 2005 to promote
development of renewable energy in Vermont.  30 V.S.A.
§§ 8001, 8005, 8005a.  The statute promotes this goal in two
ways: by requiring electric utilities to purchase a
certain amount of power from renewable energy sources, and by creating a
standard-offer program.  Under the standard-offer program, the Board
authorizes certain long-term power-purchase contracts with electrical providers
in Vermont for renewable energy projects that have a nameplate capacity of 2.2
megawatts (MW) or less and meet certain other criteria.  Id.
§ 8005a(b).  Once a plant owner executes a
standard-offer contract, the Board guarantees a set price for that plant’s
energy for the duration of the contract regardless of whether the market price
changes.  Id. § 8005a(f)(4). 
The standard-offer program is administered by the SPEED facilitator, VEPP,
Inc., which operates under a contract with the Board.  Id. § 8005a(a). 

¶ 3.            
In 2009, after soliciting public comment, the Board issued an order in
which it prescribed various procedures and requirements for the standard-offer
program.  During the comment process, VEPP asked the Board to
clarify how a plant was defined, stating that “the tenor of some questions it
had received from developers indicated that at least some developers were
anticipating construction of multiple plants at a single location that,
collectively, exceed the 2.2 MW cap.”  One of the participants in the implementation
process, Central Vermont Public Service, commented that separate projects would
need to enter into separate interconnection agreements with the utility, enter
into separate standard contracts, and obtain separate certificates of public
good.  Another participant, Renewable Energy Vermont, commented
that the statute was clear that “separate plants that share common
infrastructure and interconnection should be considered as one plant.”  

¶ 4.            
In response to these comments, the Board ordered that “[t]o the extent
that any generation components share common infrastructure, we direct [VEPP] to
consider these components as a single plant.”  It ordered VEPP to identify
and inform the Board of applications that would be on the same parcel of land
or contiguous parcels of land and would collectively exceed the 2.2 MW cap, and
stated that “[t]o the extent required, the Board will make case-by-case
determinations as to whether [such] projects constitute a single plant for
purposes of § 8002(12).”[1] 
The Board did not state what criteria would be used to determine whether
multiple projects constituted a single plant, either in the 2009 order or in
any other order or rule.

¶ 5.            
In April 2013, VEPP issued a request for proposals (RFP) for projects
that would be eligible for a power-purchase agreement under § 8005a.
 The RFP indicated that standard-offer contracts would be offered to
proposals in order of price, starting with the lowest-priced projects, until
the annual capacity cap was reached.  In response, applicant proposed
three 2.0 MW solar projects—the Bennington Solar project, the Apple Hill Solar
project, and the Sudbury Solar project.  Of the thirty-four proposals
submitted, applicant’s three projects were the lowest-priced projects. 

¶ 6.            
VEPP filed a report with the Board detailing the RFP results.  VEPP
noted that the Bennington project and the Apple Hill project would be located
on the same parcel of property and the generation components of the project
were “physically contiguous.”  It requested that the Board make a
determination as to whether or not the two projects constituted a single plant.
 If so, the combined capacity of the plant (4.0 MW) would exceed the standard-offer
program limit of 2.2 MW. 

¶ 7.            
The Board issued an order on May 16, 2013 in which it ruled that the
Bennington and Apple Hill projects consisted of a single 4.0 MW plant “[b]ecause both proposals are located on the same parcel of
land and have similar interconnection points.”  The Board accepted the
Bennington project and disqualified the Apple Hill project, which had a higher
price.  The Board authorized VEPP to enter into standard-offer contracts
with applicant for the Bennington and Sudbury projects. 

¶ 8.            
Applicant subsequently petitioned the Board to reconsider and modify its
order.  Applicant argued that the Bennington and Apple Hill projects were
“independent technical facilities” because as proposed they would connect with
the electric grid through separate three-phase lines, be separated by a fence,
have separate access roads, use separate inverters, transformers and other
equipment, and have different financing parties.  The Board issued an
order on June 28, 2013 stating that “[w]hile the
projects may be operationally independent, they are still being advanced by the
same developer, located on the same parcel of land, and adjoining each other.
Based on our review of the site plans . . . it
is reasonable to infer that they are a single plant.”  The Board stated
that applicant’s interpretation of independence would permit “any size facility
[to] be constructed so long as it could be partitioned into ‘technically
independent’ 2.2 MW pieces by including redundant equipment and separating each
piece by a mere fence.”  The Board reasoned that this type of clustered
development would frustrate the legislative goal of distributing
small-to-moderate facilities across the state’s electric grid.[2]  Applicant appeals the Board’s May
and June 2013 orders.

¶
9.            
In reviewing decisions of the Public Service Board, “we defer to the
Board’s expertise and informed judgment, and apply a strong presumption of
validity to its orders.”  Grice v. Vt. Elec. Power Co., Inc., 2008
VT 64, ¶ 7, 184 Vt. 132, 956 A.2d 561 (quotations omitted).  “Absent
a compelling indication of error, we will not disturb an agency’s
interpretation of statutes within its particular area of expertise.”  In re Verizon New Eng., Inc., 173 Vt. 327, 334-35, 795 A.2d
1196, 1202 (2002).  However, “we do not abdicate our responsibility
to examine a disputed statute independently and ultimately determine its
meaning.”  In re MacIntyre
Fuels, Inc., 2003 VT 59, ¶ 7, 175 Vt. 613, 833 A.2d 829 (mem.).  Our “paramount goal” in construing a
statute is to give effect to the intent of the Legislature.  Murdoch v. Town of Shelburne, 2007 VT 93, ¶ 5, 182 Vt. 587,
939 A.2d 458 (mem.).  We will apply the
plain meaning of a statute where it is clear and unambiguous.  In re
Verizon New Eng., 173 Vt. at 335, 795 A.2d at 1202. 

¶ 10.         In
this case, there is a “compelling indication of error.”  Id. at
334-35, 795 A.2d at 1202.  The Board’s conclusion
that the Bennington and Apple Hill projects constitute a single plant is
contrary to the plain language of the statute.  Section 8002(14) defines a
plant as follows: 

“Plant” means an independent technical
facility that generates electricity from renewable energy. A group of newly
constructed facilities, such as wind turbines, shall be considered one plant if
the group is part of the same project and uses common equipment and
infrastructure such as roads, control facilities, and connections to the
electric grid.

The second sentence makes clear
that electrical generation facilities are not independent if they share
technical features such as equipment and infrastructure.  The logical
corollary of the second sentence is that facilities that are not part of
the same project and do not share equipment and infrastructure should be
considered separate plants.  

¶ 11.         The
statute makes no mention of physical proximity or common ownership as relevant
factors in determining whether facilities are separate plants.  The
Legislature could easily have included these factors if it had intended them to
be considered, as it has elsewhere.  For example, 30 V.S.A. § 219a(a)(4),
which was added in 2011, states that “[a] group of structures or pieces of
equipment shall be considered one facility” for purposes of determining
eligibility for net metering “if it uses the same fuel source and
infrastructure and is located in close proximity.”  The statute goes on to
state that “[c]ommon ownership shall be relevant but
not sufficient to determine that such a group constitutes a facility.”  Id. 
When the Legislature enacted this provision, it simultaneously made various
modifications to § 8002.  2011, No. 47, § 7. 
Notably, it did not choose to alter the definition of a “plant” in
§ 8002(14).

¶ 12.         Under
the plain language of the statute, then, as proposed, the Bennington and Apple
Hill projects would qualify as “independent technical facilities.”  30 V.S.A. § 8002(14).  The projects will not share
common roads, control facilities, or connections to the electric grid. 
Each of the projects will have a separate interconnection agreement with GMP
and separate interconnection facilities designed and owned by GMP, which would
limit the capacity of each to 2.0 MW.  Each project must obtain a separate
certificate of public good pursuant to 30 V.S.A. § 248.  As
independent plants, both should have been awarded standard-offer contracts
under the terms of the RFP because they were the lowest and second-lowest
priced projects, respectively.

¶ 13.         We
disagree that interpreting the statute according to its plain meaning will
permit “any size facility [to] be constructed so long as it could be
partitioned into ‘technically independent’ 2.2 MW pieces by including redundant
equipment and separating each piece by a mere fence,” as the Board warned in
its June order.  As a practical matter, the facility would still have to
be cost-effective to build.  Although it was economically feasible for
applicant to install separate roads, equipment, and infrastructure and obtain separate
permits and contracts for these two projects, it will not always be cheaper or
more efficient for plants to be located next to each other.  As the Board
itself noted, there is no evidence that the prices proposed by applicant were
artificially low due to any economies of scale gained by having two facilities
side by side.  The requirement that each project obtain its own CPG also
operates as a check against abuse of the standard-offer program.  See 30
V.S.A. § 248(j)(1)(C) (requiring full review of CPG
petition where project “raise[s] a significant issue with respect to the
substantive criteria” of § 248, including environmental criteria). 

¶ 14.         Our
interpretation of § 8002(14) is consistent with the Legislature’s stated
goals of encouraging the development of renewable energy in a way that provides
affordable prices to the ratepayers of Vermont.  See 30 V.S.A. §
8001(a).  Contrary to the Board’s position, it is not inconsistent with
the legislative goal of “[p]roviding support and
incentives to locate renewable energy plants of small and moderate size in a
manner that is distributed across the state’s electric grid.”
 30 V.S.A. § 8001(a)(7).  While
the Legislature has not explicitly defined the terms “small” or “moderate,”
language elsewhere in the SPEED statute provides some indication of the
intended meaning.  Section 8007, which is entitled “Small renewable energy
plants; simplified procedures,” states that renewable energy plants of 2.2 MW
or less are entitled to streamlined approval procedures.  The title of
§ 8007 suggests that the Legislature considers “small” plants to be those
with capacities of less than 2.2 MW.  A cluster of plants totaling 4.0 MW
therefore could reasonably be defined as “moderate” in size.[3]      

¶ 15.         Indeed,
many much larger projects have been developed under the SPEED program, such as
the Coventry Landfill Methane project (8 MW) or the Kingdom Community Wind
project (63 MW).  Other large projects are in active development, such as the
Deerfield Wind project (30 MW).  Although they are not standard-offer
projects, the legislative goal set forth in § 8001(a)(7) also applies to
these types of projects, each of which generates or will generate a much
greater amount of electricity at a single location than the adjacent facilities
proposed by applicant.  It is highly unlikely that the Board would have
approved these projects if they were incompatible with the goals of the SPEED
program.  If these projects are consistent with legislative intent, then
applicant’s adjacent projects must be also.   

¶ 16.         The
Board’s decision in this case effectively imposed additional nonstatutory eligibility criteria on potential SPEED
project developers without prior notice.  Although the Board stated in its
2009 order that it would consider on a case-by-case basis whether projects
located on the same parcel of land were separate plants, it did not offer any
guidelines or promulgate any rules regarding what criteria it would consider in
making this decision.  Nor does the RFP indicate that projects proposed by
the same developer or on the same parcel of land will be considered to be a
single plant even if they otherwise comply with the statute.  While the
Board is ordinarily entitled to deference in its interpretation of a statute
within its area of expertise, we cannot uphold its decision in this case
because it was clearly erroneous.  See In re Sleigh ex rel. Unnamed
Motorists, 2005 VT 45, ¶ 10, 178 Vt. 547, 872 A.2d
363 (mem.) (“Although we give deference to the
construction of a statute by an agency responsible for administering it,
statutory interpretation is a question of law, and we cannot affirm an unjust
or unreasonable interpretation of a statute.”).  

           
The Board’s May 2013 and June 2013 orders are reversed.  We remand the
case to the Board for further agency action consistent with this decision.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











[1]
 Section 8002(12) was subsequently renumbered as § 8002(14).  2011, No. 170 (Adj. Sess.), § 10.





[2] 
The Board also justified its decision by reasoning that the Legislature
permitted streamlined review available to SPEED projects under 30 V.S.A. § 248
because of their reduced environmental impacts and that larger facilities would
have a more significant impact, making the simplified procedures inappropriate.
 As neither applicant nor the Department addressed this argument on
appeal, we will not consider it. We note, however, that each of the projects
proposed by applicant will be required to obtain a separate certificate of
public good (CPG) in accordance with
§ 248.  That section precludes use of the streamlined procedure
referred to by the Board where a proposed project “raise[s] a significant issue
with respect to the substantive criteria” of § 248, including environmental
criteria.  30 V.S.A. § 248(b), (j)(1)(C). 
Thus, if the side-by-side projects have a significant impact on the
environment, applicant may not be entitled to streamlined review of its CPG
petitions.  





[3] 
The word “small” is also used in § 8005a(b). 
That section states that standard-offer plants must be “qualifying small power
production” facilities under federal law, which defines such facilities as
those with generation capacities of less than 80 MW.  18 C.F.R.
§ 292.204(a)(1).  The combined capacity of
the Bennington and Apple Hill plants is well within this definition of a
“small” plant.