**VERIZON NEW ENGLAND INC.,
d/b/a Verizon Rhode Island**

v.

**RHODE ISLAND PUBLIC UTILITIES
COMMISSION et al.**

**No. 2002–161–M.P.**

Supreme Court of Rhode Island.

May 20, 2003.

Cameron F. Kerry, Boston, MA, Keefe Bryant Clemons, New York City, Peter J. McGinn, Steven M. Richard, Craig L. Eaton, Providence, for Plaintiff.

Leo J. Wold, Cranston, Paul J. Roberti, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## OPINION

WILLIAMS, Chief Justice.

In its petition for writ of certiorari, Verizon New England Inc., d/b/a Verizon Rhode Island (Verizon) asserts that the respondent, Rhode Island Public Utilities Commission (PUC), exceeded its authority by ordering Verizon to make voice messaging service (VMS)[1] available to local competitors at wholesale prices under the Telecommunications Act of 1996 (the act). *See* 47 U.S.C. § 251(c)(4)(A) (2001). The intervenor, Alticomm, Inc. (Alticomm), a Verizon competitor, initiated this proceeding at the PUC and we permitted Alticomm to intervene before this Court. Because the PUC's order exceeded its authority under G.L.1956 § 39–1–1(c), we grant Verizon's petition for certiorari and quash the PUC's order.

## I

### Facts and Travel

On January 10, 1997, pursuant to the act, the PUC initiated its rule-making process by issuing a Notice of Inquiry that sought to determine the types of services that should be offered for resale. Section 251(c)(4)(A) of 47 U.S.C. requires an incumbent local exchange carrier (ILEC), in this case Verizon, to resell "telecommunication services" to competitors at wholesale rates.

The act is an updated version of the Communications Act of 1934, which sought to prevent telecommunications conglomerates from monopolizing the interstate telecommunications market. *See Southwestern Bell Telephone Co. v. Apple*, 309 F.3d 713, 715 (10th Cir.2002). Congress addressed local telecommunication monopolies in the act, thereby expanding its reach into the local markets. *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 638, 122 S.Ct. 1753, 1756, 152 L.Ed.2d 871, 877 (2002). "In passing the [a]ct, Congress was faced with reconciling such competing interests as federal uniformity and state autonomy, and it struck a compromise." *Southwestern Bell Telephone Co. v. Connect Communications Corp.*, 225 F.3d 942, 948 (8th Cir.2000).

In the Notice of Inquiry, the PUC found that it had enabling authority to promulgate regulations concerning local anticompetitive measures, including resale requirements under state law, specifically title 39 of the Rhode Island General Laws, entitled "Public Utilities and Carriers." However, we note that the PUC never cited a section under that title. The PUC then directed all telecommunications carriers subject to the act to provide responsive comments.

One year after the PUC released its Notice of Inquiry, the PUC issued Order 15511 and promulgated corresponding regulations. Order 15511 was based solely on

---

1. Voice messaging service (also known as voice mail), is not defined in the Telecommunications Act (the act), but is defined in a technology encyclopedia as a "telecommunications technology used to store and transmit phone messages digitally. * * * Software controls the features and runs the system." *Macmillan Encyclopedia of Computers,* 970 (1992).

the implementation of the act, again with no specific reference to state law. The PUC concluded that all retail services provided by Verizon "shall be presumptively available to competitive local exchange carriers" (CLEC), in this case Alticomm, at a discount from the retail or tariffed rate.[2] Regulations Regarding "Avoided Cost" for Development of "Wholesale" Discounts from Retail Rates, Docket No. 2518, p. 2 (R.I. PUC March 1, 1998).

Three years after the regulations took effect, Alticomm filed a petition with the PUC requesting that it direct Verizon to resell its VMS to Alticomm at a discounted rate pursuant to Order 15511 and the regulations. Alticomm, formerly known as Eastern Telephone, is a Massachusetts corporation seeking to provide a "comprehensive package of local resale telecommunication services to residential customers in Rhode Island."

In a Report and Order released on March 11, 2002, the PUC denied Verizon's motion to dismiss and granted Alticomm's original petition. *See* In re the Petition of Eastern Telephone, Inc., Report and Order, No. 3333 (R.I. PUC March 11, 2002) (hereafter Report and Order). The PUC found that Alticomm's inability to resell VMS prevented it from obtaining 20 per-

cent of its potential customers and that it would not be cost-effective for Alticomm to provide VMS independently. *See id.* at 10. Relying upon the premise that the provisions of title 39 of the General Laws must be "interpreted and construed liberally," the PUC announced its authority to broadly interpret the term "communication." Based on that authority, the PUC determined that "communication" was synonymous with "telephone service" under title 39, asserting that the Legislature intended such an interpretation. *See id.* at 7. As a result, the PUC concluded that it had the broad statutory authority to require Verizon to resell VMS at a discount as a matter of policy because the requirement would not significantly harm Verizon. *See id.* at 10–11. Accordingly, the PUC ordered Verizon to make its VMS available to Alticomm for resale at wholesale rates. *See id.* at 12.

The PUC, however, was not writing on a clean slate. The Federal Communications Commission (FCC) already had addressed the resale of VMS and determined that VMS is an information service, not a telecommunication service as defined in the act, and therefore need not be resold at a discounted rate under the act.[3] *See* 47 C.F.R. § 64.2003 (2002). The PUC ac-

---

**2.** A tariff, in this context, is "[a] schedule listing the rates charged for services provided by a public utility, * * * (esp[ecially] one that must by law file its rates with a public agency)." Black's Law Dictionary 1468–69 (7th ed.1999).

**3.** The act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46) (2001). "Telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."

*Id.* at (43). The act defines "information service" as offering the capability "for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." *Id.* at (20). The FCC determined that "[t]he phrase 'information services typically provided by telecommunications carriers' means only those information services * * * that are typically provided by telecommunications carriers, such as Internet access or voice mail services." 47 C.F.R. § 64.2003(f) (2002).

knowledged its deviation from the federal rule but stated that "there are instances in which this Commission will exercise its independent state law authority and not automatically follow the example of the FCC." Report and Order, at 9.

Verizon timely petitioned this Court for a writ of certiorari to review the PUC's Report and Order. At the same time, Verizon filed a motion with the PUC to stay its order, which the PUC denied. Thereafter, we granted Verizon's motion to stay the Report and Order pending the outcome of the petition for certiorari. Subsequently, Alticomm moved to intervene and we granted that motion.

The issues before this Court revolve only around the authority of the PUC to direct Verizon to offer VMS to Alticomm at a discounted rate. Verizon contends that: (1) the PUC's attempt to regulate VMS is preempted by federal law, (2) if there is no preemption, the PUC had no authority under state law to require Verizon to resell VMS at wholesale rates, (3) if authorized, the regulation is not competitively neutral and, therefore, is in violation of the act, and (4) the record does not support the PUC's conclusion.

■ The PUC first points out that in Verizon's brief to the PUC, it conceded that preemption by federal law was not an issue. In its reply brief, Verizon responded that the preemption argument did not exist until the PUC issued its order, and only then could Verizon argue that federal law preempted the PUC's action. Regardless, questions of preemption by federal law are dispositive questions of law and, thus, cannot be waived. *See Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 190 (3d Cir.1998) (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir. 1993)).

Focusing on the substantive arguments, the PUC avers that its broad authority to regulate the telecommunications industry encompasses "the power to regulate the 'reasonableness' of the 'facilities and accommodations' and 'rates, tariffs, tolls and charges' of 'telephone and telegraph public utilities.'" The PUC also cites §§ 39–1–1(c), 39–1–38 and G.L.1956 § 39–2–1, which grant it broad authority to regulate utilities and rates, as well as G.L.1956 § 39–3–7 that requires the PUC to determine the character of each kind of service furnished by each public utility.[4] Further-

---

**4.** General Laws 1956 § 39–1–1(c) provides:
"there is hereby vested in the public utilities commission and the division of public utilities and carriers the exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering to the public in intrastate commerce energy, communication, and transportation services and water supplies for the purpose of increasing and maintaining the efficiency of the companies, according desirable safeguards and convenience to their employees and to the public, and protecting them and the public against improper and unreasonable rates, tolls and charges by providing full, fair, and adequate administrative procedures and remedies, and by securing a judicial review to any party aggrieved by such an administrative proceeding or ruling."

Section 39–1–38 provides:
"The provisions of this title shall be interpreted and construed liberally in aid of its declared purpose. The commission and the division shall have, in addition to powers specified in this chapter, all additional, implied, and incidental power which may be proper or necessary to effectuate their purposes. No rule, order, act or regulation of the commission and of the division shall be declared inoperative, illegal, or void for any omission of a technical nature. If any provision of this title, or of any rule or regulation made thereunder, or the application thereof to any company of circumstance, is held invalid by a court of competent jurisdiction, the remainder of the title, rule, or regulation, and the application of such provision to other companies or circumstances shall not be affected thereby. The invalidity

more, the PUC points to a recent opinion of the Vermont Supreme Court that addressed this very issue, and found no federal preemption. The Vermont Supreme Court affirmed, as a matter of state law, Vermont's regulatory commission's order directing Verizon to make VMS available at a discounted rate as a matter of state law. *See In re Petition of Verizon New England*, 173 Vt. 327, 795 A.2d 1196 (2002).

## II

## Standard of Review

The Legislature set out a very clear standard of review for this Court in reviewing a PUC decision. *See* G.L.1956 § 39-5-3. This Court must accept the PUC's findings of fact as "prima facie true" and a PUC order made in its discretion "shall not be reversed unless the [PUC] exceeded its authority or acted illegally, arbitrarily, or unreasonably." *Id.* This Court may reverse, affirm or remand the judgments or orders of the PUC "as

law or equity shall require." Section 39-5-4.

## III

## Preemption

■ The Supremacy Clause of the United States Constitution, Article VI, clause 2, preempts or invalidates state law that interferes or conflicts with any federal law. The preemption doctrine encompasses three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. *See Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 95–96, 103 S.Ct. 2890, 2899–900, 77 L.Ed.2d 490, 500–01 (1983). To determine whether the preemption doctrine invalidates the PUC's conclusion in this matter we must examine both federal law and the PUC's order.

■ A finding of express preemption involves two steps: (1) that the statute expressly provide that it shall supersede related state law, and (2) that the state enactment falls within the class of law that Congress intended to preempt. *See Gade*

of any section or sections or parts of any section or sections of this title shall not affect the validity of the remainder of the title."

General Laws 1956 § 39-2-1(a) provides:
"Every public utility is required to furnish safe, reasonable, and adequate services and facilities. The rate, toll, or charge, or any joint rate made, exacted, demanded, or collected by any public utility for the conveyance or transportation of any persons or property, including sewage, between points within the state, or for any heat, light, water, or power produced, transmitted, distributed, delivered, or furnished, or for any telephone or telegraph message conveyed or for any service rendered or to be rendered in connection therewith, shall be reasonable and just, and every unjust or unreasonable charge for the service is prohibited and declared unlawful, and no public utility providing heat, light, water, or power produced, transmitted, distributed, delivered, or furnished shall terminate the service or

deprive any home or building, or whatsoever, of service if the reason therefor is nonpayment of the service without first notifying the user of the service, or the owner or owners of the building as recorded with the utility of the impending service termination by written notice at least ten (10) days prior to the effective date of the proposed termination of service."

General Laws 1956 § 39-3-7 provides in pertinent part:
"The commission shall periodically, after having given each public utility concerned reasonable notice and an opportunity to be heard, determine and fix by order the standard amount, quality, pressure, initial voltage, and character of each kind of product or service to be furnished or rendered by each public utility, and standard condition or conditions pertaining to furnishing or rendering the same, and thereafter each public utility shall furnish and render the same accordingly."

*v. National Solid Wastes Management Association,* 505 U.S. 88, 95–97, 112 S.Ct. 2374, 2382, 120 L.Ed.2d 73, 83 (1992). The act contains no express preemption provision under this analysis and thus does not expressly preempt the PUC's interpretation of its regulation under state law.

■ The two remaining types of preemption reflect the congressional intent to preempt state laws based upon "the federal statute's 'structure and purpose.'" *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 1108, 134 L.Ed.2d 237, 244 (1996). Field preemption prohibits state regulations in an area in which Congress implemented a comprehensive regulatory framework, thereby indicating its intention to reserve that area solely for federal control. *See id.*

The fact that the act relies on state implementation to effectuate its purposes rules out field preemption. In § 251 Congress specifically refused to preclude state regulations, orders or policies that provide access to networks, are consistent with § 251, and do not "substantially prevent implementation of the requirements of this section and the purposes of this part." 47 U.S.C. § 251(d)(3)(C). As a result, there is no field preemption.

■ Conflict preemption exists when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257 (1963), "and where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 2294, 147 L.Ed.2d 352, 361 (2000) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85

L.Ed. 581, 587 (1941)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects * * *." *Id.*

■ With respect to preemption on the specific subject of VMS resale, the Vermont Supreme Court recently concluded that there was no conflict preemption because the act does not regulate VMS. *See In re Petition of Verizon New England,* 795 A.2d at 1207. In its analysis of VMS resale, the court began by citing 47 U.S.C. § 251(c)(4), which lays out the duty of carriers, then it turned to the state's definition of telecommunications services. *See Verizon New England,* 795 A.2d. at 1205–06. The court next reiterated the federal policy of promoting competition for local exchange carriers. *See id.* at 1206. The court determined that the state statute did not impermissibly conflict with the FCC regulation that classifies VMS as an information service because "state law does not interfere with federal law where state law imposes stricter standards than federal law." *Id.* at 1207. The court further held that the question of whether VMS should be required for resale was a matter of state law best left to the expertise of the state regulatory agencies and it would not reverse that determination absent clear error. *See id.* at 1206. We agree with the Vermont Supreme Court and conclude that the PUC's regulation of VMS is not preempted by the FCC regulation. However, this authority, to the extent it exists, must rest on state enabling legislation.

## IV

### State Statutory Authority

■ The PUC is vested with the exclusive authority "to supervise, regulate, and make orders governing the conduct of companies offering * * * *intrastate* com-

merce energy, communication, and transportation services" to the public. Section § 39–1–1(c). (Emphasis added.) There is no doubt that VMS is both an intrastate and interstate communication service. *See In the Matter of Petition for Emergency Relief and Declaratory Ruling Filed by the Bellsouth Corp.,* 7 FCCR 1619, 1620 ¶ 7 (FCC Feb. 14, 1992). Indeed, the FCC has established that when a caller reaches a VMS from outside the state, whether the caller is leaving or retrieving messages, the communication is interstate. *See id.* at ¶ 10. The communication is intrastate only when the caller is in the state. Although the FCC allows states to regulate mixed interstate and intrastate services as long as the regulation does not impede federal policy, our Legislature very clearly delineated the PUC's power and limited it to only intrastate communication services. In fact, both parties acknowledged at oral argument that VMS has an interstate component. Because it is impossible to separate VMS into intrastate and interstate communication services, *see id.* at 1622 ¶ 14–15, we are of the opinion that the PUC has no authority under § 39–1–1(c) to regulate VMS, nor are we persuaded

that there exists any other state enabling authority that would permit the regulation of an interstate service.

Specifically, we conclude that § 39–2–1(a) provides no authority under these circumstances.[5] That section focuses on ratemaking, not resale or the regulation of resale obligations. Even if that section applied to the resale of VMS, the Legislature's limit of the PUC's authority to intrastate communication services in § 39–1–1(c) also limits its authority under § 39–2–1(a) to intrastate services.

The Vermont Supreme Court's conclusion that its commission could regulate VMS was based entirely on specific Vermont statutes setting forth broad regulatory authority that is absent in the Rhode Island legislative scheme. Most importantly, the Vermont enactment does not limit its commission, the Public Service Board (PSB), to regulating only intrastate communication.[6] Additionally, the Vermont statutes specifically and methodically lay out the jurisdiction and authority of the PSB in a way that most obviously includes VMS.[7]

---

5. *See* note 4, *supra.*

6. Another related Vermont statute, 32 Vt. Stat. Ann. Tit. 32, § 9701(19) (1994), enacted in 1993, defines telecommunication service as an "intrastate and interstate telecommunications service as defined in 30 V.S.A. § 7501." Section 7501(a) of Vt. Stat. Ann. Tit. 36 (2000), seeking "to create a financial structure that will allow every Vermont household to obtain basic telecommunications service at an affordable price, and to finance that structure with a proportional charge on all telecommunications transactions that interact with the public switched network," defines telecommunication service as:

> "the transmission of any interactive electromagnetic communications that passes through the public switched network. The term includes, but is not limited to, transmission of voice, image, data and any other

information, by means of but not limited to wire, electric conductor cable, optic fiber, microwave, radio wave, or any combinations of such media, and the leasing of any such service." *Id.* at § 7501(b)(5).

This definition is almost identical to the one in Vt. Stat. Ann. Tit. 30, § 203(5) (2000). *See infra,* note 7. Consequently, under Vermont law, there is no intrastate limit of Vermont's Public Service Board's (PSB) jurisdiction or authority.

7. Section 203 grants the PSB jurisdiction over "persons or companies offering telecommunications service to the public on a common carrier basis" and defines telecommunications service as:

> "the transmission of any interactive two-way electromagnetic communications, including voice, image, data and information. Transmission of electromagnetic communi-

Based upon our careful review of Vermont's statutory scheme, we are satisfied that telecommunications service is specifically defined and done so in greater detail than in the act. Furthermore, Vermont's legislature clearly granted the PSB the authority to "require that [a] connection be made * * * and that conversations be transmitted and messages transferred over the connection under such rules and regulations as the board may establish, and [it] may prescribe * * * tolls and charges * * *." Vt. Stat. Ann. Tit. 30, § 2701 (2000). We are satisfied that these statutes vest the PSB with broad authority to require Verizon New England to resell at a discounted rate. It is equally clear that the PUC had no such authority.

Because we conclude that the PUC exceeded its state authority in requiring Verizon to resell VMS as a telephone service, there is no need to discuss the remaining issues concerning the sufficiency of the record or competitive neutrality of the order.

### Conclusion

Accordingly, we grant Verizon's petition for certiorari, quash the PUC's March 11, 2002, Report and Order and remand the papers in this case to the PUC with our decision duly endorsed thereon.

cations includes the use of any media such as wires, cables, television cables, microwaves, radio waves, light waves or any combination of those or similar media." Vt. Stat. Ann. Tit. 30, § 203(5).

Furthermore, the PSB has jurisdiction in all matters involving "[t]he manner of operating and conducting any business subject to supervision under this chapter, so as to be reasonable and expedient, and to promote the safety, convenience and accommodation of the public * * *." Vt. Stat. Ann. Tit. 30, § 209(a)(3) (2000). Finally, Vt. Stat. Ann. Tit. 30, § 2701 (2000), entitled "[t]ransfer of messages and interchange of service," grants the PSB the most specific authority to regulate VMS. The statute states that after a hearing and finding that a physical connection between carriers can reasonably be made,

"the board may, by its order, (a) require that the connection be made, except where the purpose of the connection is primarily to secure the transmission of local messages or conversations between points within the same city or town, and that conversations be transmitted and messages transferred over the connection under such rules and regulations as the board may establish, and (b) may prescribe through lines and joint rates, tolls and charges to be made and to be used, observed and enforced in the future." *Id.*