NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 126

No. 2015-417

| | |
|---|---|
| Great Northern Construction, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Employment Security Board |
| | |
| Department of Labor | September Term, 2016 |

Maureen Tivnan, Chair

Claudine C. Safar and Anthea Dexter-Cooper of Monaghan Safar Ducham PLLC, Burlington, for Plaintiff-Appellant.

Dirk Anderson, Montpelier, for Defendant-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **EATON, J.** This is an appeal from an Employment Security Board (ESB) decision affirming a Department of Labor audit of the appellant, Great Northern Construction (GNC). The Department's auditor concluded that GNC had improperly classified two of its workers—Ray O'Connor and David LaPointe—as independent contractors rather than employees for the purposes of unemployment insurance taxes. In accordance with Vermont's Unemployment Compensation Law, 21 V.S.A. §§ 1301-1389, the Department issued GNC an assessment for unpaid taxes from 2011 to 2014 plus interest and a penalty. GNC sought review of the assessment before an administrative law judge, who upheld the Department's tax assessment, and GNC appealed that decision to the ESB. The ESB concluded that O'Connor and LaPointe were not independent contractors as LaPointe, O'Connor, and GNC all argued, but were employees

according to Vermont's statutory definition of the term. We affirm the ESB concerning LaPointe but reverse as to O'Connor.

¶ 2. Vermont's Unemployment Compensation Law requires employers to make annual contributions to a state unemployment fund in the form of taxes on wages paid to employees but not on wages paid to self-employed workers. See 21 V.S.A. §§ 1321, 1358. The central issue in this case, then, is whether O'Connor and LaPointe were employees of GNC under the statutory definition of "employment." For the purpose of the Unemployment Compensation Law, "employment" is defined broadly as any "[s]ervices performed by an individual for wages," with the exception of services that satisfy the so-called ABC test set forth at 21 V.S.A. § 1301(6)(B). Under that test, a worker is presumed to be an employee unless the purported employer can demonstrate that: (A) the worker is free from the putative employer's control or direction; (B) the worker's services are outside the putative employer's usual course or location of business; and (C) the worker is independently established in the same business as the putative employer. 21 V.S.A. § 1301(6)(B). A worker who satisfies the ABC test is considered to be self-employed, and the employing entity therefore is not liable for unemployment insurance taxes for that worker. See 863 To Go, Inc. v. Dep't of Labor, 2014 VT 61, ¶¶ 9, 18, 196 Vt. 551, 99 A.3d 629.

¶ 3. GNC urges this Court to reverse on two grounds and hold that it is not liable for taxes on wages earned by O'Connor and LaPointe. First, GNC argues that it contracted with O'Connor's limited liability company (LLC), Ray O'Connor, LLC, and not with O'Connor the natural person. Thus, according to GNC, it is not liable for unemployment taxes paid to the LLC because an LLC is not an "individual" within the meaning of the unemployment statute and is therefore not subject to the ABC test. Second, GNC argues that the Board erred in its application of the ABC test to O'Connor and LaPointe.

¶ 4. The facts presented before the administrative law judge and affirmed by the ESB establish that GNC, a full-service professional contracting firm based in Burlington, was founded

in 1977 by Bob Schwartz, its current president. Originally, GNC's work involved restoring historic sites, and although it has since evolved into a general contracting firm, GNC continues to advertise itself as having "vast experience in challenging jobs with engineered details and a high degree of difficulty." To remain competitive in a broad range of jobs, GNC maintains relationships with skilled contract workers in addition to its five full-time employees.[1] The firm's relationships with two of those specialized workers, O'Connor and LaPointe, are the subject of this appeal.

¶ 5. O'Connor has been involved in the construction business in Vermont for approximately forty-five years. The ESB found that his particular expertise is in historic restoration, and in order to facilitate that trade and to make his bids more competitive, he owns a battery of specialized equipment.[2] Over the past decade, O'Connor has done extensive work on GNC projects. For example, in the three-year audit period from 2011 to 2014, O'Connor turned down only two or three jobs from GNC, and because he was so busy with GNC jobs during that time, he refused offers from other general contractors.

---

[1] GNC's five employees are its president, Schwartz; a three-person construction crew; and its project and office manager.

[2] O'Connor explained that "[t]ypically when [he] tell[s] people what [he] do[es], [he] tell[s] them [he] usually use[s] brushes and trowels, whereas a typical carpenter uses hammers and screw guns." Additionally, O'Connor offered the following as examples of the specialized equipment that he owns:

> "large and small air compressors, . . . commercial paint sprayers, both air and airless, . . . commercial paint rollers, portable generators, portable job heaters, a whole inventory of specialized trowels for brick, trowels for cement work, trowels for drywall[,] . . . specialized slate tools for slate roofing, special nail pullers, special slate cutters[,] . . . special slate bars[,] . . . mechanical drywall tape applicators which are much faster than traditional methods[,] . . . industrial glue guns, industrial caulking guns—not the kind that you find in the big box store, digital, measuring devices and angle finders[,] . . . mechanic lifts[,] . . . electric hoists, cabinet lifts, special drywall lifts, pneumatic jacks and a fully operating work van with tool shelves, ladder racks and tow-behind-trailer."

¶ 6.    The ESB also found that although GNC established overall project schedules for O'Connor and its other contract employees based on the nature of each project, O'Connor set his own day-to-day schedule and decided independently when to arrive at and depart from GNC job sites. Unlike other contract workers, O'Connor did not receive direction from GNC about how to complete projects, and he occasionally provided Schwartz with input as to "the methods and techniques" that each project required. O'Connor did not coordinate with other contractors apart from occasionally supplying them with materials or loaning them equipment.

¶ 7.    Despite the fact that O'Connor did not have a formal written contract with GNC, he and Schwartz had an established negotiation process in which Schwartz would alert O'Connor when GNC was considering bidding on a project that required O'Connor's expertise. If O'Connor was available and interested, he would give Schwartz a time and cost estimate that included labor, amortization of his specialized equipment, and the cost of materials. If GNC accepted O'Connor's bid, he would purchase any necessary materials with a designated O'Connor, LLC, business credit card. O'Connor then relied on GNC to pay him according to invoices that he submitted, and although he ran his business as an LLC, the invoices requested that GNC "[m]ake all checks payable to Ray O'Connor."

¶ 8.    In the same vein, O'Connor testified that he chose to organize as an LLC approximately a decade prior to the audit because doing so increased his earnings. Nevertheless, he also carried personal liability insurance and filed a Schedule C form with his federal tax return, indicating that he considered himself a self-employed individual. To that end, when Schwartz offered him a position at GNC as an employee, O'Connor declined because he "want[ed] control over [his] own activities," and because he believed that the added overhead costs to GNC of having more employees would have reduced the amount of money available to pay him.

¶ 9.    Like O'Connor, LaPointe declined an offer of employment from GNC in an attempt to preserve his independent status. When GNC made the offer, however, LaPointe had recently

moved to Vermont, and he did not have any relationship with Schwartz prior to beginning work for GNC. The ESB found that LaPointe, who specializes in restoration work, owns some specialized equipment similar to O'Connor's. The ESB also found that like O'Connor, LaPointe was free to accept or decline invitations to work on GNC projects; GNC offered as an example of LaPointe's freedom the fact that he declined, for religious reasons, to work on a GNC project that involved restoring a mural in a house of worship. LaPointe set his own schedule, was free to work for other businesses and reported to the Department auditor that his work was "NOT supervised."

¶ 10. The specifics of LaPointe's relationship with GNC, however, differed from those of its relationship with O'Connor. Although both submitted bids to GNC, LaPointe was paid hourly at a rate he pre-negotiated with Schwartz, whereas O'Connor was paid by the project according to his bid. LaPointe used his own equipment but did not supply his own materials, and unlike O'Connor, received punch lists[3] from GNC for incomplete work. He is not registered with the Secretary of State as an independent business, does not have a formal business organization, has no professional licenses, and does not file a Schedule C with his federal tax returns. Significantly, the ESB found that between 2012 and 2014, LaPointe's income from GNC was substantial.[4] He reported that he worked for only one other business—the name of which he was

---

[3] A punch list is "a roster of small but important jobs yet to be done on a construction site but necessary to be done before the construction can be considered completely finished." Black's Law Dictionary (10th ed. 2014).

[4] According to the wage reports admitted into evidence, O'Connor, LaPointe and two fulltime GNC employees earned the following amounts from work for GNC over the course of the audit period:

|  | O'Connor | LaPointe | Employee 1 | Employee 2 |
|---|---|---|---|---|
| 2011 | $26,730.00 (2Q) | $0.00 | $42,030.00 | $41,641.25 |
| 2012 | $33,055.00 | $18,541.51 (2Q) | $38,930.63 | $39,336.88 |
| 2013 | $54,545.25 | $48,601.63 | $49,595.00 | $51,066.25 |
| 2014 (2Q) | $33,212.50 | $28,648.96 |  |  |

The numbers to which the auditor testified vary slightly from the amounts reported in the wage analysis exhibits. However, because there is no evidence in the record regarding wages

uncertain—after he began working for GNC, and the Board concluded that "[i]f Mr. LaPointe did in fact work for others, the record suggests such work was sporadic and subordinate to his work for [GNC]."

¶ 11.    GNC treated O'Connor and LaPointe as independent contractors through 2014, when an auditor for the Department of Labor determined that GNC had improperly failed to classify them as employees and issued an assessment of $13,670 representing unpaid unemployment insurance taxes, a penalty, and interest.  GNC requested a hearing before an administrative law judge, who sustained the Department's determination that Ray O'Connor, LLC, qualified as an "individual" and that neither O'Connor nor LaPointe satisfied the ABC test and that they therefore qualified as GNC employees for tax purposes.  GNC appealed that decision to the ESB, which affirmed.  The ESB agreed that an LLC was an "individual" for purposes of the ABC test, that O'Connor failed parts A and B of the test, and that LaPointe did not meet any elements of the ABC test.  This appeal followed.

¶ 12.    This Court affords great deference to decisions of the ESB on appeal, and decisions within the Board's expertise are presumed to be correct.  See 863 To Go, Inc., 2014 VT ¶ 8. However, "[w]hile the Court owes deference to the Board, we are not bound by an erroneous construction of the law."  See Fleece on Earth v. Dep't of Emp't & Training, 2007 VT 29, ¶ 26, 181 Vt. 458, 923 A.2d 594.  To the extent that an appeal challenges the Board's factual findings, we affirm those findings if they are supported by credible evidence.  Id.

¶ 13.    Because we conclude that O'Connor satisfies the ABC test and GNC is therefore not liable for taxes attributable to him, it is unnecessary for us to reach the question of whether an LLC qualifies as an "individual" for the purposes of the unemployment compensation statute.

_____

earned by GNC's workers other than what is contained in the wage analysis exhibits, we look to those exhibits as the basis for interpreting the relevant earnings.

6

Regardless of whether GNC's contract with O'Connor was with the natural person or the LLC,[5] the relevant facts that bear on the application of the ABC test are the same. In other words, whether GNC's relationship was with a natural person or with an LLC, it presented sufficient evidence as to O'Connor to meet its burden under the ABC test; neither O'Connor the natural person nor the LLC was a GNC employee. Given that there is no other means by which GNC could be liable for unemployment compensation taxes on O'Connor,[6] we need not resolve the statutory question of whether an LLC can be considered an "individual" performing services for wages, and we therefore address only the application of the ABC test to O'Connor and LaPointe. Additionally, because we find that LaPointe fails part C of the test and that GNC is therefore liable for unemployment insurance taxes on him, we decline to address parts A and B as they apply to him.

¶ 14. Vermont, like a majority of the states, applies the three-pronged ABC test to distinguish between self-employed workers and employees upon whose wages an employer must pay unemployment insurance taxes. See 21 V.S.A. § 1301(B)(6); Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 593 A.2d 1177, 1114 (N.J. 1991) (reviewing history of unemployment legislation in United States and observing that "[t]he vast majority" of states "adopted some form of the ABC test" and "[a] majority of states continue to use [it]"). Vermont's "statutory definition of 'employment' is broader than the common law master and servant relation," and it encompasses "many relationships outside of the common law concepts." State v. Stevens, 116 Vt. 394, 398, 77 A.2d 844, 847 (1951). Specifically, unlike the common law, § 1301 creates a presumption of

_____

[5] We do not in this decision address the question whether "individual" includes a single-member LLC like O'Connor's LLC. The statutory language applying the ABC test to "individuals" performing services for wages predates, by many decades, the creation of the limited liability company (LLC) business form. Compare 1957, No. 105, § 1 (establishing ABC test), with Limited Liability Company Act, 1995, No. 179 (Adj. Sess.), § 4 (recognizing the LLC form). For that reason, whether "individual" includes this relatively newer business form is a difficult question that has not yet been addressed directly by this Court, or the Legislature. Given the popularity of the LLC business form, this question should be addressed by the Legislature.

[6] The issue of whether Ray O'Connor, LLC is liable for unemployment taxes on the funds paid by GNC to O'Connor is not before the Court.

employment and places the burdens of production and persuasion on a putative employer. See Fleece on Earth, 2007 VT 29, ¶ 7; Bluto v. Dep't of Emp't Sec., 135 Vt. 205, 209, 373 A.2d 518, 520-21 (1977) (reasoning that because "burden of proof rests with the employer" under § 1301(6)(B), and because employer bears burden of showing worker satisfies ABC test, failure to produce "credible or reasonable evidence during the proceedings [before Board]" results in employee designation).

¶ 15.  Section 1301(B)(6) defines employment broadly as any "[s]ervices performed by an individual for wages" unless the putative employer produces sufficient evidence to demonstrate: (A) that the worker "has been and will continue to be free from control or direction" by the business; (B) that the service performed by the worker is either outside the usual course of business of the purported employer or is performed outside the geographic area where the business operates; and (C) that the worker is "customarily engaged in an independently established trade, occupation, profession, or business." 21 V.S.A. § 1301(6)(B).

I. Part A—level of direction and control

¶ 16.  "This Court liberally construes part A of the ABC test," which, like the ABC test overall, is broader in sweep than the common law master-servant relationship. Fleece on Earth, 2007 VT 29, ¶¶ 11, 16. In particular, part A contemplates only the right of control over a worker's performance, not the actual exercise of control. See id. ¶ 11 ("The essence of the distinction at common law has always been the right to control the details of the performance—the right to specify the means and methods used in the performance of the work—rather than simply the result."); see also Hargrove v. Sleepy's, LLC, 106 A.3d 449, 459 (N.J. 2015) ("In establishing control for purposes of part A of the test, it is not necessary that the employer control every aspect of the worker's trade; rather, some level of control may be sufficient."). Other factors relevant to part A of the test include: the degree of oversight and supervision that a purported employer exercises; whether the purported employer or worker supplies tools and materials; the

8

understanding and intentions of the parties; whether a purported worker may accept or decline work from the purported employer or others without suffering adverse consequence; and whether the purported employer requires the worker to complete specific training. See Fleece on Earth, 2007 VT 29, ¶¶ 11-18; Standard Oil of Conn., Inc. v. Admin., Unemployment Comp. Act, 134 A.3d 581, 590-99 (Conn. 2016) (reviewing case law from Connecticut and other states and listing relevant factors for part A).

¶ 17.  For example, in Fleece on Earth, we held that a group of home workers were employees where the workers knitted garments for a retailer on their own time and at their own homes but according to a pattern provided by the retailer, at a price determined by the retailer, using materials provided by the retailer and subject to the retailer's approval.  2007 VT 29, ¶¶ 2, 21-22.  Likewise, in In re Bargain Busters, we held that salespeople hired by a newspaper company to sell advertising space were employees given the terms of their written contract, that the workers were paid by commission, that the company provided supplies, and that the workers were contractually prohibited from engaging in similar work for the employer's competitor.  130 Vt. 112, 113, 287 A.2d 554, 556 (1972).

¶ 18.  Here, O'Connor satisfies part A.  We note at the outset the Department's observation that "[t]he degree of direction and control in [Fleece on Earth and In re Bargain Busters] is admittedly greater than that exercised" by GNC over O'Connor.  We agree.  Unlike in Fleece on Earth or Bargain Busters, O'Connor had no formal contract with GNC dictating the terms of his working relationship, and he declined an offer of employment from GNC because, as O'Connor explained, he "want[ed] control over [his] own activities."  He set his own schedule, worked without supervision from GNC, and was free to accept or decline work with GNC or any other business.  Cf. Bargain Busters, 130 Vt. at 114-16, 287 A.2d at 556-58 (describing how employer controlled aspects of employees' schedules, prohibited employees from accepting similar employment, and dictated details of employees' work duties).  Though not determinative,

it is notable that O'Connor rejected an offer of employment from GNC in order to preserve his independent status, demonstrating that the parties did not intend to create an employer-employee relationship. See Standard Oil of Conn., Inc., 134 A.3d at 592.

¶ 19. Additionally, O'Connor used his own specialized equipment, purchased all of the materials that he used on GNC sites using a designated O'Connor, LLC, business credit card, sometimes supplied materials to other subcontractors and instructed Schwartz about the "methods and techniques" that he used to complete specialized projects. Finally, unlike the workers in Fleece on Earth and In re Bargain Busters, O'Connor negotiated his own pay schedules on a project-to-project basis. As the Department nearly concedes, the control retained by GNC was the right to control the result of the work, not control over the means and methods to accomplish it. GNC has established that O'Connor satisfies part A of the ABC test.

II. Part B—outside the usual course of business

¶ 20. Part B of the test requires a putative employer to demonstrate that a worker's services are performed "outside the usual course of the business," or "outside of all of the places of business."[7] 21 V.S.A. § 1301(6)(B)(ii). Only the first aspect of part B—outside the usual course of business—is at issue in this case. "The clear focus of [part B] is [the purported employer's] business and the services performed within the usual course of that business, not within the usual course of the 'business' of the person performing services for him [or her]." Burchesky v. Dep't of Emp't Training, 154 Vt. 355, 361, 577 A.2d 672, 675 (1989). Factors relevant to part B include whether the worker's business is a "key component" of the putative employer's business, how the purported employer defines its own business, which of the parties supplies equipment and

_____

[7] Part B is disjunctive and provides in full that service performed by an individual for wages is employment unless "[s]uch service is either outside the usual course of the business for which such service is performed, or that such service is performed outside all of the places of business of the enterprise for which such service is performed." 21 V.S.A. § 1301(6)(B)(ii). Only the first half of part B—outside the usual course of business—is relevant here, since all of O'Connor and LaPointe's work for GNC was performed on GNC job sites.

materials, and whether the service the worker provides is necessary to the business of the putative employer or is merely incidental. See Fleece on Earth, 2007 VT 29, ¶ 22 (concluding that home knitting and sewing was "the key component of the apparel business" (citing Vt. Inst. of Cmty. Involvement v. Dep't of Emp't Sec., 140 Vt. 94, 99, 436 A.2d 765, 767 (1981); Carpetland U.S.A., Inc. v. Ill. Dep't of Emp't Sec., 776 N.E.2d 166, 186 (Ill. 2002) ("[T]he key to this inquiry is whether the services are necessary to the business of the employing unit or merely incidental. . . . The washing of windows or mowing of grass for a business is incidental. But when one is in the business of selling a product, sales calls made by sales representatives are in the usual course of business because sales calls are necessary. When one is in the business of dispatching limousines, the services of chauffeurs are provided in the usual course of business because the act of driving is necessary to the business." (citation omitted)); Gerber Dental Ctr. Corp. v. Me. Unemployment Ins. Comm., 531 A.2d 1262, 1264 (Me. 1987); Sebago v. Boston Cab Dispatch, Inc., 28 N.E.3d 1139, 1150 (Mass. 2015) ("[A] purported employer's own definition of its business is indicative of the usual course of that business.").

¶ 21.    In Gerber Dental, the Maine court interpreted a statute identical to Vermont's in order to determine whether dentists who worked at a dental center were employees. 531 A.2d at 1264. In applying part B of the statutory ABC test, the court considered, among other relevant details, the fact that the dental center provided and owned nearly all of the equipment and supplies that the dentists used. Id. That equipment, in turn, was essential to the provision of the dental center's business—"the provision to the public of the full range of dental services"—such that the center would have been capable of providing the dentists' services even without those particular dentists. Id.

¶ 22.    Here, the ESB and the administrative law judge both concluded that GNC failed to produce sufficient evidence to show that O'Connor was performing services outside the ordinary course of GNC's business. In reaching that conclusion, the factfinders considered only the

testimony of GNC's project manager that restoration has been a part of GNC's business for many years and the fact that O'Connor spent the majority of his time working for GNC; neither the Board nor the administrative law judge made an express finding about the nature of the restoration work done by GNC compared to the work done by O'Connor, nor did they consider O'Connor's specialized equipment in their analysis under part B. The Board gave weight to the amount of time O'Connor spent working for GNC compared to other companies, but that fact is not relevant to deciding if their services were within the ordinary course of GNC's business and "it was error for the Board to consider [that fact] in deciding this issue." Fleece on Earth, 2007 VT 29, ¶ 26.

¶ 23. "While the Court owes deference to the [ESB], we are not bound by an erroneous construction of the law," and we "hold that the facts as found by the [ESB] regarding these two [workers] would satisfy part [B] of the test." Id. ¶ 26. Consistent with Fleece on Earth, our analysis requires that we consider all relevant facts found below, including those that the factfinders did not include in their analysis of part B. Id. ¶¶ 24-26. (where ESB's decision rested on part A of test, "question[ing] th[e] logic" of ESB's determination that worker was not independently established and considering additional evidence not considered by ESB that worker "owned her own equipment and had knitted for other companies and individuals in the past" in applying part C). Taking into account the nature of GNC's work versus the nature of O'Connor's work, as well as his specialized equipment, we hold that O'Connor satisfies part B.

¶ 24. On the one hand, while it is true that GNC once focused on historic restoration, the ESB and the administrative law judge found that it has since evolved into a general contracting firm "doing a mix of residential and commercial work." See Sebago v. Boston Cab, 28 N.E.3d at 1150 ("[A] purported employer's own definition of its business is indicative of the usual course of that business."). The firm does general remodeling and construction projects without the help of O'Connor and LaPointe. On the other hand, O'Connor does highly specialized restoration work that the Department acknowledges GNC "would not be able to provide . . . without [his] services."

Cf. Gerber Dental, 531 A.2d at 1264. He owns specialized equipment that GNC does not, and that unique equipment—which is necessary to effectively and timely restore fragile buildings and structures—forms the foundation of his business.[8]  In other words, the services that O'Connor provides to GNC are not necessary to the business of general construction and contracting, and historic restoration was not a "key component" of GNC's business at the time of the audit, although it may have been in the past.  See Fleece on Earth, 2007 VT 29, ¶ 22; Carpetland U.S.A., 776 N.E.2d at 186.  The highly specialized tools, equipment and expertise that O'Connor provided enabled GNC to perform work in a specialized segment of the construction market, and that establishes that his services were not within the usual course of GNC's general contracting business.  O'Connor therefore satisfies part B of the test.

### III. Part C—independently established

¶ 25.    The focus of part C is whether the worker is "independently established providing the same or similar services as they provide for the employer," not merely whether the purported employee has independent employment of any sort, and the relevant inquiry involves the purported worker's ability to sustain an economic existence independent of the purported employer.  Vt. Inst. of Cmty. Involvement, 140 Vt. at 100, 436 A.2d at 768; Sebago, 28 N.E.3d at 1153 ("The critical inquiry under this prong is whether the worker is capable of performing the service to anyone wishing to avail themselves of the services, or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." (quotation

---

[8] For example, Schwartz explained at the hearing before the administrative judge that GNC was "working on a very specialized job that requires that [they] preserve and move a historic artifact.  [They] cannot use power equipment for fear of vibrating and damaging this project. . . .  So that takes a very specialized technician."  As O'Connor testified, "because I have so much complex and specialized equipment, even if I come in at the same price as say another contractor, I can usually do it typically much faster, because of the equipment, inventory that I have.  So that's how I can stay competitive, and yet still be profitable."  O'Connor's ownership of so much specialized equipment "[a]bsolutely" influenced his decision to organize as an LLC rather than accept permanent employment with a general contractor because his ownership of the equipment allows him to specialize in the narrow field of historic renovation.

omitted)); Carpetland U.S.A., 776 N.E.2d at 190 ("[T]his [prong] requires that the individual's entrepreneurial enterprise must enjoy a degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services." (quotation omitted)). The Department has not challenged the Board's determination that O'Connor was independently established and therefore satisfied part C of the test. Since we hold he also meets prongs A and B of the test, the Board's determination that he is an employee of GNC must be reversed. We therefore confine our analysis of part C to LaPointe.

¶ 26. We reiterate that § 1301(6)(B) creates a presumption of employment and that the employer therefore bears the burden of production and persuasion as to all three prongs of the ABC test. See Fleece on Earth, 2014 VT 29, ¶¶ 7, 27; Bluto, 135 Vt. at 208-09, 373 A.2d at 520-21. The burden of presenting the Board with evidence that LaPointe was independently established rested with GNC. Based on the facts in the record GNC failed to satisfy that burden.

¶ 27. GNC argues that "[i]t is contrary to the evidence in the record and assumes facts not in evidence when the DOL states that work LaPointe was doing for other companies and individuals was 'sporadic and subordinate to his work for GNC.' " However, it is clear that the Board relied upon record evidence—namely a questionnaire filled out by LaPointe that indicated the name of only one other potential person to whom he provided services—in concluding that "[i]f Mr. LaPointe did in fact work for others, the record suggests such work was sporadic and subordinate to his work for [GNC]." Additionally, LaPointe was new to the construction business in Vermont, was not registered as an independent business with the Secretary of State, did not file a Schedule C form with his federal tax returns, and advertised only by word-of-mouth, indicating that he did not consider himself self-employed and that his economic existence is not independent of GNC's.[9] See Vt. Inst. of Cmty. Involvement, 140 Vt. at 100, 436 A.2d at 768. LaPointe's

---

[9] GNC argues that the fact that LaPointe declined to work on one of GNC's projects, the preservation of a historic mural at a place of religious worship, is evidence that LaPointe was independently established. This argument is unavailing. Schwartz testified that LaPointe declined

14

income from GNC in 2013—the only year for which his wage reports are complete—was roughly equivalent to that of GNC's full-time employees. See supra, note 5. The ESB found that he reported a "significant" amount of income from GNC between 2012 and 2014, and while he may have been working for other businesses, GNC acknowledges that "evidence of [his] income during the period of review is not in the record." The failure to present that evidence precludes GNC from rebutting the presumption of employment and leaves us with no basis upon which to disturb the Board's finding that LaPointe was not independently established. LaPointe fails part C of the ABC test and therefore was properly determined to be an employee of GNC. Because we conclude that LaPointe was not independently established and therefore fails part C of the ABC test, he is deemed to be GNC's employee for the purposes of 21 V.S.A. § 1301(6)(B) and GNC is liable for the portion of unpaid unemployment taxes attributable to LaPointe.

The Decision of the ESB is affirmed as to LaPointe and reversed as to O'Connor. The case is remanded to the Department of Labor for a determination of GNC's liability for unpaid unemployment insurance taxes, penalties and interest attributable to wages earned by LaPointe.

FOR THE COURT:

_____

Associate Justice

---

to work on the mural project due to his religious beliefs. The fact that GNC did not take any negative action against LaPointe for declining work based on his religious beliefs shows nothing more than that GNC was mindful of its potential obligations under federal law, as GNC would have owed the same consideration to any of its permanent employees. See E.E.O.C. v. Abercrombie & Fitch Stores, Inc., ___ U.S. ___, 135 S. Ct. 2028, 2034 (2015) ("[Title VII] gives [religious practices] favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual . . . because of such individual's' 'religious observance and practice.' " (quoting 42 U.S.C. § 2000e(j))).