NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 27

No. 2019-226

In re Petition of Chelsea Solar LLC, Pursuant to 30 V.S.A. § 248, for a Certificate of Public Good Authorizing the Installation and Operation of the "Willow Road Project," A 2.0 MW Solar Electric Generation Facility on Willow Road in Bennington, Vermont

Supreme Court

On Appeal from Public Utility Commission

January Term, 2020

Anthony Z. Roisman, Chair

Thomas Melone of Allco Renewable Energy Limited, New York, New York, for Appellant.

Sarah L. J. Aceves, Special Counsel, Montpelier, for Appellee Vermont Department of Public Service.

L. Brooke Dingledine of Valsangiacomo, Detora & McQuesten, P.C., Barre, for Appellees/ Cross-Appellants Apple Hill Homeowners Association and Mt. Anthony Country Club.

PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.     **REIBER, C.J.**   Developer Chelsea Solar LLC seeks a certificate of public good (CPG) to construct and operate a 2.0-megawatt (MW) solar electric generation facility off of Willow Road in Bennington, Vermont (the "Willow Road Facility").  The Public Utility Commission (PUC) denied developer's petition, concluding that the Willow Road Facility and an adjoining facility proposed by developer, "Apple Hill Solar," (the "Apple Hill Facility") were a single 4.0-MW "plant" under the applicable definition of this term.  In its decision, the PUC also considered and rejected arguments by intervenors Apple Hill Homeowners Association (AHHA)

and Mt. Anthony Country Club (MACC) regarding various CPG factors. It concluded, among other things, that the project would not unduly interfere with the orderly development of the region under 30 V.S.A. § 248(b)(1) or have an undue adverse effect on aesthetics under § 248(b)(5).

¶ 2.     Developer appeals, challenging the PUC's single-plant determination and its orders granting permissive intervention to AHHA and MACC. Intervenors cross-appeal and argue that the PUC erred in concluding that the CPG factors cited above were satisfied. We affirm the PUC's decision to deny the CPG based on its conclusion that the Willow Road and Apple Hill Facilities are a single plant. Given our conclusion, we find it unnecessary to reach the PUC's evaluation of the CPG factors. We find no error in the PUC's permissive-intervention decision.

## I.  Overview

¶ 3.     Developer seeks to take advantage of Vermont's Sustainably Priced Energy Enterprise Development (SPEED) Program, which "promote[s] development of renewable energy in Vermont." In re Programmatic Changes to the Standard-Offer Program, 2014 VT 29, ¶ 2, 196 Vt. 175, 95 A.3d 999 (citing 30 V.S.A. §§ 8001, 8005, 8005a). The program "requir[es] electric utilities to purchase a certain amount of power from renewable energy sources" and "creat[es] a standard-offer program" that allows for "long-term power-purchase contracts with electrical providers in Vermont." Id. (discussing SPEED program). The PUC "guarantees a set price for [a standard-offer] plant's energy for the duration of the contract regardless of whether the market price changes." Id.; see also 30 V.S.A. § 8005a(f). The program is now called the standard-offer program. See 2015, No. 56.

¶ 4.     To be eligible for this program, a project's proposed "plant capacity" cannot exceed 2.2 MWs. 30 V.S.A. § 8005a(b). This serves the Legislature's goal of "[p]roviding support and incentives to locate renewable energy plants of small and moderate size in a manner that is distributed across the State's electric grid." Id. § 8001(a)(7).

¶ 5.     As applicable here, the term "plant" means:

2

an independent technical facility that generates electricity from renewable energy. A group of newly constructed facilities, such as wind turbines, shall be considered one plant if the group is part of the same project and uses common equipment and infrastructure such as roads, control facilities, and connections to the electric grid.

Id. § 8002(14) (2012).

¶ 6.     The Legislature subsequently amended this language. It removed the words "newly constructed" from the second sentence above and added the following sentence at the end: "Common ownership, contiguity in time of construction, and proximity of facilities to each other shall be relevant to determining whether a group of facilities is part of the same project." Id. § 8002(18); see also 2013, No. 99 (Adj. Sess.), § 3 (adding this language).

¶ 7.     The PUC found that developer filed a complete application before the 2014 amendment and that developer had asserted, and been found to have, vested rights in the laws in effect at the time of its initial application.

## II.  History of Willow Road and Related Projects

¶ 8.     With this overview in mind, we turn to the history of the projects involved here. In 2013, developer submitted several 2.0-MW projects in response to a request for proposals, including "Apple Hill Solar" and "Bennington Solar."[1] Bennington Solar was later renamed "Chelsea Solar" and it evolved into the Willow Road project at issue here.

¶ 9.     In 2013, the PUC[2] ruled that Apple Hill and Bennington Solar, as then designed, were a single 4.0-MW plant because both projects were "located on the same parcel of land" and "ha[d] similar interconnection points." Programmatic Changes, 2014 VT 29, ¶ 7. The PUC

---

[1]  The PUC used the term "developer" to encompass various corporate entities controlled by Thomas Melone and Michael Melone; it noted that the Melones also served as counsel of record in the Apple Hill and Willow Road cases. We use the term "developer" in the same way.

[2]  "Prior to July 1, 2017, the Public Utility Commission was known as the Public Service Board." In re Investigation into Programmatic Adjustments to Standard-Offer Program, 2018 VT 52, ¶ 1 n.1, 207 Vt. 496, 191 A.3d 113. We use PUC throughout this decision for consistency, even when referring to decisions before July 1, 2017.

"accepted the Bennington project and disqualified the Apple Hill project, which had a higher price." Id. It authorized developer to enter into a standard-offer contract for Bennington Solar. Id.

¶ 10. Developer moved for reconsideration, arguing the two facilities were independent because "they would connect with the electric grid through separate three-phase lines, be separated by a fence, have separate access roads, use separate inverters, transformers and other equipment, and have different financing parties." Id. ¶ 8. The PUC denied the motion. It found that "[w]hile the projects m[ight] be operationally independent, they [were] still being advanced by the same developer, located on the same parcel of land, and adjoining each other," and based on its "review of the site plans," it was "reasonable to infer that they [were] a single plant." Id. Developer's interpretation, the PUC reasoned, "would permit any size facility to be constructed so long as it could be partitioned into 'technically independent' 2.2 MW pieces by including redundant equipment and separating each piece by a mere fence." Id. (quotation marks omitted) (brackets omitted). It found that "this type of clustered development would frustrate the legislative goal of distributing small-to-moderate facilities across the state's electric grid." Id.

¶ 11. We reversed this decision on appeal. We found that the statute, as then drafted, did not mention "physical proximity or common ownership as relevant factors in determining whether facilities are separate plants." Id. ¶ 11. Instead, it contemplated that "electrical generation facilities are not independent if they share technical features such as equipment and infrastructure." Id. ¶ 10. We concluded that the projects did not share infrastructure and equipment because they would "not share common roads, control facilities, or connections to the electric grid"; each would "have a separate interconnection agreement with GMP [(Green Mountain Power)] and separate interconnection facilities designed and owned by GMP, which would limit the capacity of each to 2.0 MW"; and each would be required to "obtain a separate certificate of public good." Id. ¶ 12. We found our conclusion "consistent with the Legislature's stated goals" of promoting renewable

4

energy at affordable prices and encouraging small- and moderate-size plants across the state's electric grid. Id. ¶ 14. We thus concluded that developer was entitled to a standard-offer contract for each of its proposals.

¶ 12. Developer executed two standard-offer contracts for its projects and sought CPGs for each. It changed the name of Bennington Solar to Chelsea Solar. In February 2016, the PUC denied a CPG for Chelsea Solar, concluding that the project failed to satisfy several CPG factors. Developer eventually filed an amended petition with the PUC seeking to install and operate a 2.0-MW solar facility in approximately the same location as the Chelsea Solar project. This is the Willow Road Facility at issue in this appeal.[3]

### III. Willow Road Facility and PUC Decision on Appeal

¶ 13. In a June 2019 decision, the PUC denied developer's request for a CPG to install and operate a 2.0-MW plant at the Willow Road Facility. It found that developer's proposals had significantly changed since 2013 and that Willow Road and Apple Hill were now one "plant" given their use of common electrical infrastructure agreed to by a common developer as part of a common development scheme.

¶ 14. While the term "project" was not defined in the 2014 statute, the PUC found that developer's behavior here satisfied a dictionary definition of this term as it involved "a plan or proposal; a scheme" or "an undertaking requiring a concerted effort." The PUC explained that both facilities were located on a 27.3-acre tract in Bennington and they "share[d] the same landlord." That landlord, like Chelsea Solar LLC and Apple Hill LLC, was a subsidiary of developer. The PUC found that developer had decided that the development of 4.0 MW of solar electric generation on Apple Hill would best be accomplished with two individual proposed

---

[3] Meanwhile, the PUC granted a CPG for the Apple Hill Facility. We reversed and remanded this decision on appeal. See In re Apple Hill Solar LLC, 2019 VT 64, __ Vt. __, 219 A.3d 1295. On remand, the PUC denied the CPG and developer's appeal of that decision is currently pending before this Court.

facilities. Developer filed two petitions for separate standard-offer contracts and then filed separate CPG petitions for the facilities.

¶ 15. By filing separate petitions, developer was able to obtain two standard-offer contracts that guaranteed payment for the 4.0-MW facility, even though the Legislature had explicitly limited the size of the standard-offer projects to 2.2 MW. Developer later financed a joint system-impact study for the two facilities and adopted GMP's conclusion that the combined 4.0-MW solar field should connect to the existing electric grid via a one-mile-long GMP line extension. The PUC found this was a single 4.0-MW plant, resulting from a single plan for developing the 27.3 acres on Apple Hill in Bennington. The "project site" encompassed both facilities, which fit together like puzzle pieces.

¶ 16. The PUC emphasized the differences in the proposals since 2013. As proposed in 2013, the facilities had separate access roads and separate interconnection facilities. Willow Road's access road had originally headed north via Russett Drive into the Apple Hill residential neighborhood. It now extended south and east for approximately 600 feet where it then ran parallel with the Apple Hill Facility's access drive. The two access drives ran in parallel for approximately 300 feet until they met just beyond the point where Willow Road met the property line.

¶ 17. The Willow Road Facility's point of interconnection had also moved. In 2013, it was located north of the facility at the Russett Drive cul-de-sac. Now, it would interconnect with a new GMP line extension. This line extension began at the southern part of the Willow Road Facility, connected with the Apple Hill Facility, and then proceeded for approximately one mile along Willow Road and Hewitt Road until it tied into the grid at the intersection of Hewitt Drive and East Road.

¶ 18. The Apple Hill Facility also differed from the 2013 proposal because it had a reduced footprint as a result of new technology. More significantly to the PUC, the Apple Hill

6

Facility would no longer interconnect to an existing residential line but would instead share use of the GMP line extension with the Willow Road Facility.

¶ 19. The PUC found that the line extension was new infrastructure needed for both the Willow Road and Apple Hill Facilities to connect to the electric grid. It was being funded by developer. The PUC concluded that this made the two facilities a single plant under 30 V.S.A. § 8002(14).

¶ 20. The PUC was unpersuaded by developer's argument that the facilities were independent because GMP would own the line extension. It agreed that once constructed, the Willow Road Facility would deliver energy to GMP that would travel along the line extension. But it did not agree that GMP's final ownership of the line somehow meant that the Willow Road and Apple Hill Facilities were not using and sharing that new, common electrical infrastructure. It found that but for the line extension, the facilities could not exist. And but for the facilities, the line extension would not exist.

¶ 21. The PUC also rejected developer's argument that each facility was a separate, sole-use facility and was not shared with each other or the utility, nor was the utility's distribution system shared or used by either generating facility. It found this assertion did not comport with the system impact study or the statutory requirement that the facilities not share common infrastructure, including a connection with the existing electrical grid. While, under the PUC's rules, developer would pay for and benefit from the line extension with GMP as the owner of that line, the PUC did not find this rule dispositive of the question before it. See Interconnection Procedures for Proposed Electric Generation Resources § 5.500, https://puc.vermont.gov /document/commission-rule-5500-electric-generation-interconnection-procedures [https://perma .cc/T899-TN3K ].

¶ 22. The joint system-impact study proposed a single interconnection facility rather than two separate interconnection facilities attached to residential distribution lines, one north and one

7

south. While the two facilities did have separate points of interconnection, the PUC determined that they did not have "separate interconnection facilities designed and owned by GMP, which would limit the capacity of each to 2.0 MW," as in the earlier proposals. Cf. Programmatic Changes, 2014 VT 29, ¶ 12. There was now a single interconnection facility for both facilities. It reiterated that this new interconnection facility, paid for by developer as part of the common scheme of development, made the two facilities a single plant.

¶ 23. The PUC noted that it had become common practice for large projects, which would otherwise be ineligible for the net-metering or standard-offer programs, to be split into smaller neighboring facilities with separate, parallel, infrastructure so as to meet the statutory definition of separate plants. That was what developer originally proposed to do with its two existing facilities on Apple Hill—each facility had an entirely separate line connecting it to the existing electric grid. But the new proposals reflected GMP's requirement for a mile-long interconnection facility that would be shared by both facilities. By avoiding the cost of installing separate infrastructure, the PUC found that developer would benefit from the economies of scale available to a large 4.0-MW project while receiving the incentives of the standard-offer program. It concluded that this would not serve the goal of distributing small renewable energy projects around the state.

¶ 24. The PUC concluded that the single-plant determination was relevant to its CPG analysis under § 248 for two reasons. First, because all of the evidence developer submitted in support of its application for a CPG was based on a description of a 2.0-MW solar plant, rather than a 4.0-MW plant, developer's evidence was defective and developer could not meet its burden of demonstrating compliance with § 248. Second, developer took advantage of the statutory conditional waiver of the burden of establishing various § 248 criteria that applies to standard-offer contract holders. The PUC explained that because the proposal as modified was for a single 4.0-MW plant, developer was not entitled to a standard-offer contract and could not take advantage of those statutory waivers. Developer's application was accordingly incomplete.

8

¶ 25. The PUC acknowledged that its decision to deny the CPG rendered moot the remaining arguments against issuance of the CPG. It nonetheless addressed these arguments because they had been otherwise reviewed and considered. The PUC concluded that the project satisfied the CPG factors.

¶ 26. Ultimately, based on the single-plant issue, the PUC disapproved the petition without prejudice to developer's ability to file an amendment to the petition consistent with its determination. This appeal and cross-appeal followed.

## IV. Merits

### A. Single Plant

¶ 27. Developer challenges the PUC's conclusion that the Willow Road and Apple Hill projects are one "plant" under 30 V.S.A. § 8002(14). It argues that the facilities have separate points of interconnection, the output of each plant would be limited to 2.0 MW, and the projects do not share access roads. Developer asserts that the common ownership and physical proximity of the facilities are irrelevant, as is the joint funding for and use of the line extension. It cites to the same rule that the PUC considered and rejected below. Developer further argues that the PUC's policy analysis is flawed and that it was rejected by this Court in Programmatic Changes, 2014 VT 29. Finally, developer contends that the PUC violated its due process and equal protection rights by treating similar cases differently. Developer raises other arguments that we summarily reject.[4]

---

[4] This includes developer's assertion that the PUC was barred by the doctrine of res judicata from considering if the Willow Road and Apple Hill Facilities were a single plant. "Res judicata bars the litigation of a claim or defense if there exists a final judgment in former litigation in which the parties, subject matter and causes of action are identical or substantially identical." Lamb v. Geovjian, 165 Vt. 375, 379, 683 A.2d 731, 734 (1996) (quotations omitted). The PUC acknowledged that if developer's current proposals were the same as those at issue in Programmatic Changes, 2014 VT 29, it would find two separate plants. But it found the plans for the two facilities had been significantly amended since that ruling and developer acknowledged the existence of factual differences. Thus, the doctrine would not apply. See Am. Trucking Ass'ns, Inc. v. Conway, 152 Vt. 363, 371, 566 A.2d 1323, 1328 (1989) (holding that res judicata

¶ 28. On review, we defer to the PUC's "interpretation of statutes within its particular area of expertise," but "we do not abdicate our responsibility to examine a disputed statute independently and ultimately determine its meaning." Programmatic Changes, 2014 VT 29, ¶ 9 (quotations omitted). "Our paramount goal" in construing a statute is to effectuate the Legislature's intent and where the language of a statute is plain, we must enforce it as written. Id. We conclude that the PUC did not commit clear error in concluding that the Willow Road and Apple Hill Facilities, as now proposed, are one "plant" under § 8002(14).

¶ 29. As set forth above, we concluded in Programmatic Changes that as originally proposed, developer's facilities were not a single plant—despite being physically contiguous and having common ownership—because each would have an entirely separate line connecting it to the electric grid and would not share common roads. 2014 VT 29, ¶ 12. As amended, however, developer's proposed facilities are not only commonly owned, physically contiguous, and designed to "fit together," but their interconnection to the grid requires developer to construct a mile-long line extension at its own expense, the use of which will be shared by the facilities and which the PUC considered to be a single interconnection facility. Based on these facts, the PUC concluded that the Apple Hill and Willow Road Facilities were a single 4.0-MW plant because

does not apply where evidence in two cases is "sufficiently different" such that claims are not "identical for claim preclusion purposes"). Developer's assertion that the PUC was required to seek relief from the 2014 judgment under Vermont Rule of Civil Procedure 60 is similarly meritless.

Developer also argues that the definition of "plant," including its reference to "newly constructed facilities," is unconstitutionally vague and standardless. Developer fails to show that it preserved this argument and we therefore do not address it. See, e.g., Jordan v. Nissan N. Am., Inc., 2004 VT 27, ¶ 10, 176 Vt. 465, 470, 853 A.2d 40 ("It is well settled . . . that matters not raised at trial may not be raised for the first time on appeal.").

Finally, developer asserts that the PUC could not consider the single-plant issue but was instead obligated to issue a CPG once it determined that the CPG factors were satisfied. As noted above, the PUC considered and rejected a variation of this argument below, and developer fails to show that the PUC erred in reaching its conclusion.

they are part of the same project and use common infrastructure. See 30 V.S.A. § 8002(14) (2014). The PUC's interpretation of the statutory definition of a plant is reasonable and consistent with legislative intent, and we therefore defer to it. See Programmatic Changes, 2014 VT 29, ¶ 9 ("Absent a compelling indication of error, we will not disturb an agency's interpretation of statutes within its particular area of expertise." (quotation omitted)).

¶ 30.    None of petitioner's arguments persuade us otherwise. The PUC recognized that the facilities would have separate points of interconnection but reasonably concluded that the jointly funded line extension was shared equipment. Its conclusion that the combined output of both plants would be 4.0 MW is supported by the record, regardless of whether the output of each plant would be limited to 2.0 MW as developer asserts. Under the statute, they are considered one plant.

¶ 31.    The PUC did not err in concluding that GMP's ultimate ownership of the line extension, as provided under its rules, was not dispositive of the single-plant issue. Section 8002(14) does not address final ownership of equipment and infrastructure; it focuses instead on the use of common—i.e., shared—equipment and infrastructure. As the PUC found, the shared distribution line will be paid for by developer and would not otherwise exist but for this project. This supports the PUC's conclusion that the facilities use common infrastructure.

¶ 32.    The statute similarly does not require exclusive use of common infrastructure for facilities to be considered a single plant. While developer argues that the PUC's interpretation will encompass any facility that uses a shared line, the single-plant determination is limited by the additional requirement that facilities be part of the same "project."

¶ 33.    Developer fails to show that the PUC clearly erred in finding that the facilities here were part of the same "project." It was reasonable for the PUC to rely on a dictionary definition of this then-undefined term in ascertaining its meaning. See Khamnei v. Burlington Pub. Works Comm'n, 2018 VT 19, ¶ 14, 206 Vt. 550, 183 A.3d 1157 ("Words that are not defined within a

11

statute are given their plain and ordinary meaning, which may be obtained by resorting to dictionary definitions." (quotation omitted)). As detailed above, the facilities were pursued and developed as part of a common scheme. It is evident that the PUC determined that these facilities would be "newly constructed" using a commonsense understanding of these words. They did not need to be literally built at the same time, as developer appears to suggest.

¶ 34. In Programmatic Changes, we did not preclude the PUC from considering various factors in evaluating whether a group of facilities was part of the same project. Our focus in Programmatic Changes was the use of shared equipment and infrastructure and we did not consider as a separate matter whether the facilities were part of the same "project" under § 8002(14). We recognized there that proximity and common ownership alone would not make two purportedly distinct facilities into a single plant; what was lacking in that case was the use of shared equipment or infrastructure. 2014 VT 29, ¶¶ 10-12.

¶ 35. Developer also asserts that to be a single plant, facilities must use "common equipment and infrastructure." Developer fails to show that he raised this argument below and we therefore do not address it. See In re S.B.L., 150 Vt. 294, 297, 553 A.2d 1078 (1988) (explaining that appellant bears burden of demonstrating how trial court erred warranting reversal, and Supreme Court will not comb record searching for error); see also V.R.A.P. 28(a)(4) (appellant's brief should explain what issues are, how they were preserved, and what appellant's contentions are on appeal, with citations to authorities, statutes, and parts of record relied upon). We note, however, that the key question as identified in Programmatic Changes is whether the facilities "share technical features such as equipment and infrastructure," 2014 VT 29, ¶ 10, using these as examples rather than requiring a showing of both. The PUC reasonably concluded here that the facilities' shared funding for, and use of, the line extension satisfied the statute.

¶ 36. Developer also fails to show that the PUC has treated similar cases differently in violation of its rights. The cases it cites are factually distinct. In Petition of Norwich Technologies,

12

Inc., No. 18-2120-NPM (PUC Aug. 28, 2019), https://epuc.vermont.gov/?q=node/64/133289/FV-BDIssued-PTL, the PUC concluded that the proposed facilities at issue were not one plant because they were not part of the same "project." Id. at 14. The PUC distinguished the case from Willow Road, No. 17-5024-PET, finding it significant that the proposed facilities did not share common ownership and the lease for each facility was distinct; they were not planned simultaneously as in Willow Road; and they did they "fit together like puzzle pieces" as in that case. Id. at 11-13. Having found no single "plant" based on the threshold requirement of the statute, the PUC only briefly responded to the Department of Public Service's "shared infrastructure" arguments. It reiterated that it must consider shared infrastructure as part of its analysis and rejected the argument that it should consider single plants as separate just to avoid "duplicate infrastructure;" it also rejected the contention that "duplicate infrastructure would harm Vermont ratepayers." Id. at 16. Petition of Norwich Technologies is distinguishable from the instant case. See id. at 7.

¶ 37.    Developer's reliance on Petition of South Ridge Solar Park, LLC, No. 18-2621-NMP, 2019 WL 194913, at *3 (PUC Jan. 10, 2019), is equally misplaced. In that case, the PUC considered a CPG petition for a 500-kW "group net-metered solar electric generation project" in Middlebury that had two other 500-kW solar arrays immediately to the project's north and south. The Department requested additional information about whether the project was part of a larger "plant" under the revised definition of this term in 30 V.S.A. § 8002(18). According to prefiled testimony on behalf of the applicant, its project was approximately 125 feet from the existing northern and southern arrays; it had its own access road, which paralleled the access road for the northern array for a short distance; it connected to a GMP-owned line-extension as did the existing facility to the north; and access to the line extension was not limited to solar projects. The applicant stated that it could modify the proposal if the PUC considered joint use of the line-extension to be common infrastructure.

¶ 38. The PUC granted the CPG without discussing this issue, noting that the Department had requested additional information on the separate plant issue and that the Department did not dispute that the project involved separate plants. Id. at *2. The PUC did not make any findings on this question with respect to the funding and use of the line extension or other aspects of the definition of the term "plant" and we do not find South Ridge Solar Park persuasive here.

¶ 39. While developer believes the PUC's policy analysis was flawed and inconsistent with Programmatic Changes, we disagree. Our conclusion in Programmatic Changes rested on the fact that these two facilities were not a single plant because they did not share common equipment or infrastructure. That is no longer the case. As reconfigured, the facilities share common infrastructure.

¶ 40. We note that our conclusion in this § 248 case is consistent with the statutory scheme governing the standard-offer program and the policy considerations underlying that scheme. As the PUC emphasized, the standard-offer program aims to "[p]rovid[e] support and incentives to locate renewable energy plants of small and moderate size in a manner that is distributed across the State's electric grid." 30 V.S.A. § 8001(a)(7). The definition of "plant" in § 8002 was written to ensure that large projects, which can gain economies of scale based on their large size, do not take advantage of incentives intended for small projects. Developer has pursued one large project here and it would be unfair to allow it to take advantage of incentives available only to small and medium projects. We find no error in the PUC's conclusion that the two facilities are a single plant under 30 V.S.A. § 8002(14). Because we uphold the PUC's denial of a CPG on this basis, we do not reach the PUC's evaluation of the CPG factors.[5]

_____

[5] Intervenors submitted a motion during the pendency of this appeal indicating that, on remand from this Court, a hearing officer had recommended denying a CPG for the Apple Hill Facility. Intervenors expressed concern that this could eliminate the single-plant issue in the instant case. If the Court affirms the PUC's decision that the two facilities were a single plant, intervenors ask the Court to nonetheless address their arguments regarding the CPG factors. We deny intervenors' request. The CPG application is essentially invalid because it relates to a

14

## B. Permissive Intervention

¶ 41.    We next consider developer's assertion that the PUC erred in granting permissive intervention to AHHA and MACC.  According to developer, intervenors failed to demonstrate a substantial and particularized interest different from other members of the public below and the PUC failed to so find.  It characterizes intervenors' concerns as speculative.  Developer maintains that, given the failure to make this showing, intervenors lack standing to raise any claims on appeal.

¶ 42.    As previously noted, intervenors sought, and were granted, permissive intervention under PUC Rule 2.209(B), https://puc.vermont.gov/sites/psbnew/files/doc_library/Commission %20Rule%202.200%20%289-15-18%29%20Adopted%20CLEAN.pdf.  That rule provides in relevant part:

> A person may, in the discretion of the Commission, be permitted to intervene in any proceeding when the applicant demonstrates a substantial interest which may be affected by the outcome of the proceeding.  In exercising its discretion . . . , the Commission shall consider (1) whether the applicant's interest will be adequately protected by other parties; (2) whether alternative means exist by which the applicant's interest can be protected; and (3) whether intervention will unduly delay the proceeding or prejudice the interests of existing parties or of the public.

Id.

¶ 43.    "Permissive intervention under Rule 2.209(B) is discretionary, so we reverse such a decision only if we find abuse of discretion."  In re Green Mountain Power Corp., 2018 VT 97, ¶ 13, 208 Vt. 349, 198 A.3d 36 (quotation omitted).  "[W]e will find an abuse of discretion where an agency has declined to exercise its discretion or has done so on untenable or unreasonable grounds."  In re Joyce, 2018 VT 90, ¶ 12, 208 Vt. 226, 197 A.3d 378 (quotation omitted).  We defer to the PUC's evaluation of whether a proposed intervenor demonstrates a substantial and

---

theoretical facility—a 2.0-MW facility—that is not in fact the "plant" found to exist by the PUC. We cannot review the PUC's analysis of the CPG factors given that we have upheld the PUC's determination that this plant is not in fact the one proposed in developer's CPG petition.

particularized interest under its intervention rules. <u>Green Mountain Power Corp.</u>, 2018 VT 97, ¶ 18.

¶ 44. In <u>Apple Hill</u>, we found the PUC's order granting permissive intervention sufficient in itself "to satisfy the constitutional requirement of a particularized injury in fact." 2019 VT 64, ¶ 19. We held that the PUC's evaluation of intervention under its rules "necessarily rested on a determination that [intervenors] had established substantial and particularized interests in the proceeding." <u>Id</u>. Even if constitutional or statutory law required something more than the showing under the PUC rules, we concluded that the neighboring landowners in that case, which included AHHA, "articulated substantial and particularized interests that might be injured by the project." <u>Id</u>. ¶ 20. Mindful that "[a] broad range of injuries, including injuries to aesthetic interests, can be sufficient to establish standing," <u>id</u>. ¶ 19, we explained that intervenors "established a threat of actual and particularized injury" based on the possibility that the project would "increase wind speeds" and harm the views from their properties. <u>Id</u>. ¶ 20. We found "[t]hese particularized aesthetic injuries . . . sufficient to establish both parties' standing to appeal." <u>Id</u>.

¶ 45. In this case, the record shows that AHHA sought permissive intervention with respect to certain issues, including the aesthetic impact of the project resulting from increased noise and wind and the effect on its views. It asserted that there was no other way to protect its interests because the town and the state had different interests. David Griffin and Maru Leon, the owners of the MACC, also requested permissive intervention. They expressed a concern about the effect of the project on the views from their public golf course and expressed interest in certain areas. They stated that there were no parties in the case who had the same or similar interests to be protected.

¶ 46. The PUC exercised its discretion in granting intervenors' requests for permissive intervention. It issued two written orders that recognized developer's objections and nonetheless deemed permissive intervention appropriate. By granting the requests for permissive intervention,

the PUC necessarily determined that intervenors "established substantial and particularized interests." See id. ¶ 19 (recognizing that grant of permissive intervention necessarily requires PUC to determine that intervenors "established substantial and particularized interests").

¶ 47. The PUC did not err in implicitly concluding that intervenors articulated potential aesthetic injuries that fell within the scope of the interests protected by 30 V.S.A. § 248 and that were uniquely felt by them. See generally Green Mountain Power Corp., 2018 VT 97, ¶¶ 21-22 (deferring to PUC's determination whether particular interest offered by proposed intervenor fell within scope of § 248 criteria). As we have explained, "[t]he PUC's procedures on intervention are governed by its own rules, which it must make and apply in pursuit of its mandate under 30 V.S.A. § 248" and "[i]t accordingly has flexibility to decide whose presence as a party would productively inform its policy-making." Id. ¶ 23. It did not err in allowing intervenors to participate here.

¶ 48. We note that the PUC's discretionary ruling in this case is consistent with our conclusion in Apple Hill, 2019 VT 64, ¶ 20, and with prior PUC rulings allowing intervention in similar cases. See, e.g., Petition of Otter Creek Solar LLC, No. 19-0516-PET, 2019 WL 3241675 (PUC July 12, 2019).

¶ 49. The Otter Creek petition, for example, similarly involved the construction of a solar project in Bennington. The proposed intervenors were neighboring landowners who argued, among other things, that the project would "create aesthetic impacts, cause disruptive noise during construction and operations and [was] inconsistent with Bennington and Regional plans." Id. at *1. The petitioner opposed the request, arguing in part that "the harm claimed by the proposed intervenors [was] speculative and not specific to them." Id. at *3. The PUC granted permissive intervention, finding that the alleged injuries were "only speculative because the project has not yet been built and testimony has yet to be presented regarding how the proposed project will impact the aesthetics of the area." Id. It emphasized that "[a]n intervenor need not prove its case in order

to be admitted" and that the proposed intervenors' claims were "based on harm they will suffer, not harm to the general public." Id.

¶ 50. Tellingly, the PUC reached a different conclusion as to two other proposed intervenors, a nonprofit organization and a state legislator. These intervenors did not own or occupy any property near the proposed project and they did not allege "that such property will be impacted by violations of any of the § 248 criteria." Id. The PUC also found that the nonprofit organization did not "demonstrate[] that its articles of incorporation or by-laws identif[ied] non-profit purposes relevant to preventing undue adverse aesthetic impacts or violations of local or regional energy planning standards at this location." Id. It thus concluded that these intervenors "failed to make a demonstration of how their interests will be impacted by the alleged violations of § 248 and thus they fail[ed] to meet the standards for intervention under" the PUC rules. Id.

¶ 51. Consistent with its precedent and ours, the PUC acted within its discretion in considering intervenors' aesthetic interests sufficient for purposes of permissive intervention.

We affirm the PUC's determination that the Willow Road and Apple Hill Facilities are a single plant under 30 V.S.A. § 8002(14) (2014) and we affirm its intervention orders.

FOR THE COURT:

Paul L. Reiber
Chief Justice

18